1   JEFFREY I. WEINBERGER (State Bar No. 056214)
    *Jeffrey.Weinberger@mto.com*
2   STUART N. SENATOR (State Bar No. 148009)
    *Stuart.Senator@mto.com*
3   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue
4   Los Angeles, CA 90071-1560
    Telephone: (213) 683-9100
5   Facsimile: (213) 687-3702

6   ROHIT K. SINGLA (State Bar No. 213057)
    *Rohit.Singla@mto.com*
7   MICHELLE FRIEDLAND (State Bar No. 234124)
    *Michelle.Friedland@mto.com*
8   JEREMY S. KROGER (State Bar No. 258956)
    *Jeremy.Kroger@mto.com*
9   MUNGER, TOLLES & OLSON LLP
    560 Mission Street
10  San Francisco, CA 94105-2907
    Telephone: (415) 512-4000
11  Facsimile: (415) 512-4077

12  Attorneys for Defendant
    ABBOTT LABORATORIES

13

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                   WESTERN DIVISION

17

18  Kaiser Foundation Health Plan Inc.,    | CASE NO. CV-02-02443-JFW (FMOx)

19              Plaintiff,    | **DEFENDANT ABBOTT LABORATORIES' OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

20       vs.

21  Abbott Laboratories,    | Hearing Date:    September 16, 2009
                              Time:            10:00 a.m.
22              Defendant.    | Room:            Courtroom F
                              Pre-Trial Conf.: Jan. 8, 2010
23                            | Trial:           Jan. 26, 2010

24                            | JUDGE: HON. JOHN F. WALTER

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................. 1

II.  BACKGROUND .............................................................................. 2

    A.   Many Drugs Were Therapeutic Substitutes for Hytrin and Competed with Hytrin ............................................................ 2

    B.   Most Drugs Compete with Their Therapeutic Substitutes .................. 5

    C.   Brand-Name Drugs Have Different Cost Structures from Generic Drugs .................................................................... 6

    D.   Overall, Hytrin's Selling Price Did Not Decline Following Generic Entry ...................................................................... 6

III. ARGUMENT ................................................................................. 7

    A.   Kaiser's Motion Fails at the Threshold Because Kaiser Has Not Proven a Relevant Market .................................................... 7

    B.   Kaiser's Motion Fails Because Abbott Has Presented Overwhelming Evidence That It Lacked Monopoly Power ............. 13

    C.   The Case Law Rejects the Argument That Generic Drug's Price Effects in the Market Are Direct Evidence of Monopoly Power ....... 16

IV.  CONCLUSION ............................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Allen-Myland, Inc. v. IBM Corp.*,
33 F.3d 194 (3d Cir. 1994) ................................................................. 10

*American Tobacco Co. v. United States*,
328 U.S. 781, 66 S. Ct. 1125, 90 L. Ed. 1575 (1946) ......................... 9

*Blue Cross & Blue Shield v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) .............................................................. 17

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) ......... 10, 11

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) ............................................................ 18

*Fount-Wip, Inc. v. Reddi-Wip, Inc.*,
568 F.2d 1296 (9th Cir. 1978) ......................................................... 8, 9

*FTC v. Indiana Fed'n of Dentists*,
476 U.S. 447, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986) .............. 9, 11

*Image Technical Services, Inc. v. Eastman Kodak Co.*
125 F.3d 1195 (9th Cir. 1997) ............................................................ 13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008) ............................................. 11

*In re Int'l Tel. & Tel. Corp.*,
104 F.T.C. 280 (1984) ........................................................................ 10

*In re Remeron Direct Purchaser Antitrust Litig.*,
367 F. Supp. 2d 675 (D.N.J. 2005) ......................................... 1, 15, 16, 17

*Jefferson Parish Hospital District No. 2 v. Hyde*,
466 U.S. 2, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984) ...................... 9, 12

*K.M.B. Warehouse. Distribs., Inc. v. Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995) ................................................................ 10

*L.A. Land Co. v. Brunswick Corp.*,
6 F.3d 1422 (9th Cir. 1993) ............................................................... 10

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
924 F.2d 1484 (9th Cir. 1991) ......................................................... 8, 9

*NCAA v. Board of Regents of University of Oklahoma*,
468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) ................. 9, 12

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir. 1999) ............................................................. 12

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......................................................... 8, 15

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993) ............. 8, 11

1

2

## TABLE OF AUTHORITIES
### (continued)

Page(s)

3    *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
      875 F.2d 1369 (9th Cir. 1989) ............................................................... 1, 8, 9, 11

4    *Todd v. Exxon Corp.*,
      275 F.3d 191 (2d Cir. 2001) ................................................................... 10

5

6    *Toys "R" Us, Inc. v. FTC*,
      221 F.3d 928 (7th Cir. 2000) ................................................................. 9, 10

7    *United States v. Aluminum Co. of Am.*,
      148 F.2d 416 (2d Cir. 1945) ................................................................... 10

8    *United States v. Baker Hughes Inc.*,
      908 F.2d 981 (D.C. Cir. 1990) ................................................................ 10

9

10   *United States v. Grinnell Corp.*,
      384 U.S. 563, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966) ................................ 7, 11

11   *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
      382 U.S. 172, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965) ............................... 1, 8, 13

12

### TREATISES

13   ABA Section of Antitrust Law, Antitrust Law Developments (5th ed. 2002) .......... 7

14   Areeda & Hovenkamp, Antitrust Law (2d ed. 2002) ................................... 7

15   Hovenkamp et al., IP and Antitrust (2004) ............................................ 18

16   Irving Scher, Antitrust Adviser (4th ed. 2007) ....................................... 7

17

18

19

20

21

22

23

24

25

26

27

28

ABBOTT'S OPPOSITION TO KAISER'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
CV-02-02443-JFW (FMOx)

1  **I.**  <u>**INTRODUCTION**</u>

2         The Court should deny Kaiser's motion for partial summary judgment

3  on its *Walker Process* claim for each of three independently sufficient reasons.

4         *First*, monopoly power cannot be shown in a Section 2 *Walker Process*

5  case without defining the relevant market.  The Supreme Court specifically so held

6  in the *Walker Process* decision itself.  *Walker Process Equip., Inc. v. Food Mach.*

7  *& Chem. Corp.*, 382 U.S. 172, 177-78, 86 S. Ct. 347, 350-51, 15 L. Ed. 2d 247

8  (1965) ("Without a definition of th[e] market there is no way to measure [the

9  defendant's] ability to lessen or destroy competition.").  The Ninth Circuit has

10 similarly held that "defining the relevant market is indispensable to a

11 monopolization claim." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d

12 1369, 1373-74 (9th Cir. 1989).  Kaiser's motion does not attempt to define the

13 relevant market, and Kaiser simply ignores these holdings.

14         *Second*, even if Kaiser's evidence could support a finding of monopoly

15 power (which it cannot), it certainly does not compel such a finding.  Kaiser has

16 provided no basis for ignoring the extensive evidence, some of it from Kaiser's own

17 fact and expert witnesses, that Abbott's Hytrin was merely one drug, with less than

18 a 50-percent market share, competing in the crowded therapeutic class of alpha-

19 blockers.  Kaiser cites not a single case or other authority in support of its argument

20 that its supposed evidence of monopoly power is entitled to conclusive weight, and

21 cannot be controverted by contrary evidence.

22         *Third*, the Courts have rejected the idea that the type of evidence on

23 which Kaiser relies constitutes "direct evidence" of monopoly power.  Specifically,

24 the courts have held that it is not reasonable to make a finding of supra-competitive

25 pricing (and, thus, monopoly power) from the fact that generic drugs enter the

26 market at a price below that of brand-name drugs.  Brand-name drug companies

27 have higher cost structures because they have to engage in research and

28 development activities that generic companies do not. *See In re Remeron Direct*

1   *Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 681-82 (D.N.J. 2005). It is telling

2   that Section II of Kaiser's memorandum of points and authorities cites not a single

3   case, treatise or other authority of any sort — not one — to support Kaiser's

4   argument that there is direct evidence of monopoly power here.

5   **II.    BACKGROUND**

6           Abbott's papers in support of its motion for summary judgment set

7   forth some of the evidence showing that Abbott did not have monopoly power in

8   the market in which Hytrin competed during the relevant period. That evidence,

9   and the additional evidence cited herein, also establishes that Kaiser is not entitled

10  to summary judgment in its favor on the issue of monopoly power.

11          **A.    Many Drugs Were Therapeutic Substitutes for Hytrin and**

12                  **Competed with Hytrin.**

13          As Kaiser has itself admitted, "Hytrin, Abbott's brand name version of

14  Terazosin Hydrochloride, belongs to a group of drugs known as 'alpha-blockers'."

15  Abbott's Statement of Genuine Issues of Material Fact in Opposition to Kaiser's

16  Motion for Partial Summary Judgment ("SGI") ¶ 55. In addition to Hytrin and its

17  generic alternative terazosin, the alpha-blockers include Cardura (generically,

18  doxazosin), Minipress (generically, prazosin), and Flomax (generically,

19  tamsulosin). SGI ¶ 56.

20          Abbott's expert urologist Dr. Soloway has testified that all of these

21  products do much the same thing in much the same way. SGI ¶ 57. As Dr.

22  Soloway testified, Cardura, in particular, is a very close substitute for Hytrin: "[A]s

23  far as efficacy, we would all agree that [Hytrin and Cardura are] equally effective as

24  I indicated earlier in my testimony." SGI ¶ 61. Indeed, Dr. Soloway's testimony is

25  that Cardura and generic doxazosin are as close substitutes for Hytrin as generic

26  terazosin. SGI ¶ 60.

27          Kaiser's witnesses agree with Dr. Soloway. In binding Rule 30(b)(6)

28  testimony, the chief of Kaiser's drug research and information division, Marta

ABBOTT'S OPPOSITION TO KAISER'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
CV-02-02443-JFW (FMOx)

1   Millares, admitted that Cardura (doxazosin) is a perfect therapeutic alternative to

2   Hytrin and that the products competed head-to-head on price.  SGI ¶ 62.  Indeed,

3   Kaiser placed Hytrin on its formulary instead of Cardura *only* because of Hytrin's

4   lower price:

5   Q.    Do you have any reason to think that either Terazosin [Hytrin]

6         or Doxazosin [Cardura] are more effective for the treatment of

7         BPH than the other?

8   A.    No.

9   Q.    So you believe that they are equally effective for the treatment

10        of BPH?

11  A.    Yes.

12  Q.    Do you believe that Terazosin [Hytrin] has any therapeutic

13        advantages over Doxazosin [Cardura]?

14  A.    Therapeutic advantage, no.

15  Q.    Does it have any other kind of advantage?

16  A.    No.

17  Q.    So is it fair to say that the decision about whether they put

18        Terazosin or Doxazosin on the Kaiser formulary is driven

19        largely by comparative cost?

20  A.    *Comparative efficacy.  There's no particular efficacy advantage.*

21        *Comparative safety.  There's no particular safety advantage.*

22        *Convenience.  There's no convenience advantage.  And cost.*

23        *There was a huge cost advantage.  Big cost advantage.*

24  SGI ¶ 66.

25        Kaiser's conduct in the marketplace is also evidence that the other

26  alpha-blockers are therapeutic and economic substitutes for Hytrin.  During pricing

27  negotiations with Abbott over Hytrin, Kaiser threatened repeatedly to switch to

28  Cardura or Minipress if Abbott did not lower its price.  SGI ¶ 64.  Abbott took this

ABBOTT'S OPPOSITION TO KAISER'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
CV-02-02443-JFW (FMOx)

1    threat seriously, as Kaiser intended, because some Kaiser regions had previously

2    switched between different alpha-blockers to treat BPH *as a result of cost*

3    *considerations*.  SGI ¶ 65.  Kaiser regions are able to make this switch by changing

4    the drugs listed on their "formularies" for particular conditions.  At Kaiser, virtually

5    all patients are given the drug listed on the formulary for a particular condition.

6    SGI ¶ 67 ("Kaiser enjoys extremely high formulary compliance.").

7        A third-party insurance company also viewed the various alpha-

8    blockers as substitutable for each other and price-competitive.  SGI ¶ 68  Abbott

9    also understood that purchasers viewed these drugs as substitutes for each other,

10   and it created price and other incentives for managed care organizations to favor

11   Hytrin over competing alpha-blockers.  SGI ¶ 69.

12       Abbott's expert Dr. Langenfeld has also opined that Hytrin competed

13   based on price with the therapeutic class of alpha-blockers.  SGI ¶ 87.  In other

14   words, the therapeutic class of alpha-blockers acted as a check on Abbott's ability

15   to raise the price of Hytrin without losing sales.  In reaching this opinion, Dr.

16   Langenfeld both examined specific instances of price competition (SGI ¶ 89) and

17   conducted an econometric analysis (SGI ¶ 90).

18       Hytrin's market share within the therapeutic class of alpha-blockers

19   had been falling well before the entry of generic terazosin, starting with somewhat

20   less than 50 percent in 1995, and dropping to about 30 percent in 1999.  SGI ¶ 70.

21   The econometric data show that Hytrin was losing share to generic Cardura and

22   Flomax (a new brand-name alpha-blocker) before entry of generic terazosin.  SGI ¶

23   71.  Abbott's expert determined that the "negative impact of the generic Cardura

24   entry on Hytrin sales and the negative impact of the introduction of Flomax are

25   about 66 percent and 54 percent that of generic terazosin, respectively."  SGI ¶ 72.

26   In plain English, this means that the magnitude in the reductions of Hytrin sales

27   attributable to the introduction of generic Cardura and attributable to the

28   introduction of Flomax are about 66 percent and 54 percent respectively of the

1   magnitude in the reduction of Hytrin sales due to the introduction of generic

2   terazosin.  This shows that Generic Cardura and Flomax were, thus, highly effective

3   competitors with Hytrin.

4           The analyses by Kaiser's expert also show that after the entry of

5   generic terazosin with its lower price, there was a *decline* in sales of Hytrin and

6   generic terazosin combined, again reflecting competition from therapeutic

7   alternatives.  SGI ¶ 74.  Based upon these and other similar facts, Dr. Langenfeld

8   has opined that, as an economic matter, Abbott lacked monopoly power.  SGI ¶ 87.

9           **B.**      **Most Drugs Compete with Their Therapeutic Substitutes.**

10           Before he was retained in this case, Kaiser's expert Prof. Berndt

11   explained that "[p]harmaceutical markets are usually bounded in terms of

12   therapeutic classes of drugs, the members of which often are therapeutic

13   substitutes."  SGI ¶ 59.  According to Prof. Berndt, there are "many . . . examples of

14   well-defined pharmaceutical markets . . . in which drugs all do much the same thing

15   . . . in much the same way, and while their side effects and interactions differ

16   somewhat, they are all therapeutic substitutes."  SGI ¶ 59.  For these reasons, he

17   concluded that each pioneer brand-name drug is *not* usually a monopoly:  "[m]arket

18   exclusivity for a certain brand of prescription pharmaceutical drug does not usually

19   generate a pure monopoly situation, because most branded drugs face competition

20   from other brands within a given therapeutic class."  SGI ¶ 59.

21           As discussed above, the evidence here shows that what is generally

22   true of pharmaceutical markets is true specifically with respect to Hytrin and the

23   alpha-blocker therapeutic class.  As noted, Dr. Soloway, has opined that other

24   alpha-blockers are interchangeable with Hytrin, Dr. Langenfeld has analyzed the

25   economic data and found that other alpha-blockers constrained Hytrin's pricing,

26   and all of this testimony is reinforced by the similar testimony from the relevant lay

27   witnesses, including Kaiser's Rule 30(b)(6) designee.

28

**C.**     **Brand-Name Drugs Have Different Cost Structures from Generic Drugs.**

In its current motion, Kaiser's arguments for a finding of monopoly power are based upon the premise that the lowest price at which Hytrin or generic terazosin has been sold after generic entry constitutes the only "competitive" price for Hytrin and any higher price had to have been "supra-competitive." Yet the evidence shows that brand-name pioneer drug companies make enormous research and development investments to develop new drugs like terazosin. The prices of drugs like Hytrin have to include these long-run R&D costs, which are much higher than the marginal or "short-run" manufacturing and marginal costs that constitute almost all the cost of generics. SGI ¶ 77. As Kaiser's Dr. Berndt explains, "if one accounts for the opportunity cost of capital from the[] sunk R&D and then computes economic rates of return [to brand-name pharmaceutical companies], they are very similar to those obtained in other industries." SGI ¶ 78. Abbott's expert, Dr. Langenfeld, has similarly opined that "the price of an innovator drug such as Hytrin has to be set higher than the price of the generic version of the innovator drug, such as generic terazosin. Otherwise, the brand-name drug manufacturer will not be able to recoup its R&D and promotional costs." SGI ¶ 78.

In other words, one cannot legitimately conclude that a brand-name drug is priced at a supra-competitive level from the mere fact that, once generic entry occurs, either the brand-name product or its generic counterpart is available for a much lower price. Kaiser presents no evidence, let alone conclusive evidence, to the contrary.

**D.**     **Overall, Hytrin's Selling Price Did Not Decline Following Generic Entry.**

To the extent that the price at which Abbott sold Hytrin following generic entry has relevance to the issue of whether the prior price was "supra-competitive," it must be noted that Kaiser's expert Dr. Berndt found that the

1   average price of Hytrin remained "roughly stable" from pre- to post-generic entry.

2   SGI ¶ 86.  The lower price offer on which Kaiser relies — Abbott's August 1999

3   offer to sell Hytrin tablets to Kaiser at a lower price once Kaiser had obtained an

4   offer from Geneva, the first generic entrant — must be viewed in context.  First,

5   this special pricing on tablets (that Kaiser alone purchased) was not a reflection of

6   Abbott's more general pricing in the marketplace on Hytrin capsules (that patients

7   preferred).  As just noted, overall, even taking into account the Kaiser special

8   discount, Hytrin pricing remained roughly what it had been before generic entry.

9   Second, Kaiser is, by its own admission, a "formidable negotiator."

10   SGI ¶ 81.  Kaiser negotiates contracts with drug companies on a national basis,

11   taking advantage of the buying power associated with representing more than eight

12   million patient lives.  SGI ¶ 79.  As Prof. Berndt explained, Kaiser "can say to a

13   potential seller . . . if you won't offer us the price that we think we can get from a

14   competitor, we can move market share [to a competitor] very, very decisively" —

15   *i.e.*, Kaiser can put a competitor's drug on its formulary and require its doctors to

16   prescribe the competitor's drug.  SGI ¶ 81.

## III.   ARGUMENT

### A.   Kaiser's Motion Fails at the Threshold Because Kaiser Has Not Proven a Relevant Market.

20   As Abbott' showed in its pending motion for summary judgment,

21   "[u]nder Section 2 of the Sherman Act, identification of the relevant market is

22   *essential* to proving monopolization or attempted monopolization."  ABA Section

23   of Antitrust Law, Antitrust Law Developments (5th ed. 2002) at 528 (emphasis

24   added); *accord* 1 Irving Scher, Antitrust Adviser § 1.22 (4th ed. 2007) ("Antitrust

25   Adviser"); IIA Areeda & Hovenkamp, Antitrust Law ¶ 531c, at 189 (2d ed. 2002)

26   ("[W]e must define a market in order to see whether the defendant dominates it.").

27   The Supreme Court has repeatedly explained that a critical element of a Section 2

28   claim is proof of monopoly power "in the relevant market."  *United States v.*

1   *Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1704, 16 L. Ed. 2d 778

2   (1966).

3               In the very *Walker Process* decision on which Kaiser's sole remaining

4   claim is based, the Supreme Court explained that "[w]ithout a definition of th[e]

5   market there is no way to measure [the defendant's] ability to lessen or destroy

6   competition."  382 U.S. at 177-78; *see also Thurman*, 875 F.2d at 1373-74

7   ("[D]efining the relevant market is indispensible to a monopolization claim.");

8   *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978) ("[T]o

9   define and to prove the relevant market . . . is a necessary predicate for evaluating

10  claims under these provisions [including Sherman Act section 2] of the antitrust

11  laws.").  When, subsequent to its *Thurman Industries* decision, the Ninth Circuit

12  held that defining a relevant market was not necessary in the limited circumstance

13  in which a Section 2 claim was based upon attempted monopolization rather than

14  upon actual monopolization, the Supreme Court reversed and squarely held that

15  market definition was a necessary element of an attempt claim as well.  *Spectrum*

16  *Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S. Ct. 884, 892, 122 L. Ed. 2d

17  247 (1993) (reversing verdict for plaintiff because jury instructions allowed finding

18  for plaintiff "without any proof of the relevant market or of a realistic probability

19  that the defendants could achieve monopoly power in that market").

20              The Ninth Circuit has repeatedly granted judgment as a matter of law

21  to the defendant where the plaintiff's proposed relevant market lacks evidentiary

22  support.  In *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995),

23  for example, the Ninth Circuit upheld a determination on summary judgment that

24  the plaintiff's proposed market of self-service gasoline stations was implausible

25  because it excluded potential competition from full-service stations.  *Id.* at 1436-37.

26  The court disregarded the conclusion of plaintiff's expert witness because it made

27  no economic sense.  *Id.*  In *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,

28  924 F.2d 1484, (9th Cir. 1991), the Ninth Circuit affirmed summary judgment for

1   the defendant because the plaintiff's proposed market of private medical

2   radiologists implausibly excluded potential competitors such as university and

3   osteopathic radiologists as well as radiological services from non-radiologist

4   physicians. *Id.* at 1489-90.  In *Fount-Wip*, the Ninth Circuit sustained a JNOV in

5   the defendant's favor on a Section 2 claim where the plaintiff adduced no evidence

6   that its market definition "reflect[ed] the economic realities of the whipped topping

7   industry" and the defendants introduced evidence of additional commodities that

8   were "functionally interchangeable with aerosol whipped cream" and which

9   competed based upon price with aerosol whipped cream.  568 F.2d at 1301.

10  Finally, in *Thurman*, the Ninth Circuit affirmed summary judgment because

11  plaintiff's proposed relevant market of home center stores ignored potential

12  competition from other classes of retailers.  875 F.2d at 1377.

13          None of Kaiser's cases casts doubt upon the vitality of these binding

14  precedents, much less supports partial summary judgment in Kaiser's favor.  Many

15  of Kaiser's cases arise under Section 1 of the Sherman Act, not Section 2.  For

16  example, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 106 S. Ct. 2009, 90

17  L. Ed. 2d 445 (1986), *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2,

18  104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984), and *NCAA v. Board of Regents of*

19  *University of Oklahoma*, 468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984),

20  were all Section 1 cases.[1]  Sherman Act Section 1 outlaws certain types of joint

21  action and, for certain offenses, may require a showing of some power to influence

22  prices market-wide.  In unusual circumstances, even a twenty percent share of a

23  relevant market can provide such "market power."  *See Toys "R" Us, Inc. v. FTC*,

24  221 F.3d 928, 937 (7th Cir. 2000).  By contrast, Section 2's *monopoly* power

25

26  _____

    [1] Kaiser's only other Supreme Court authority, *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S. Ct. 1125, 90 L. Ed. 1575 (1946) (cited by Kaiser at

27  13:3-4), did not discuss whether a showing of relevant market is necessary to show monopoly power in a Section 2 claim, and cannot be argued to cast doubt on

28  *Walker Process*'s holding approximately twenty years later.

1   requirement refers to a particularly extreme form of *market* power.  *Monopoly*

2   power involves not just some ability to influence market-wide prices, but the ability

3   to push prices to what economists call the "monopoly" level.  In a seminal case,

4   Judge Learned Hand stated that 90 percent of the relevant market is "enough" to

5   infer monopoly power, but 60 to 64 percent is "doubtful."  *United States v.*

6   *Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945).  And in the absence of

7   barriers to entry, even a 100 per cent market share may be insufficient.  *See L.A.*

8   *Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1426-27 (9th Cir. 1993).

9           "Market power," thus, has wide-ranging meaning.  "[T]he term

10  'market power' is used here to describe a whole continuum along which the power

11  to control prices varies, beginning with the complete absence of market power at

12  one end and ending with monopoly power at the other."  *In re Int'l Tel. & Tel.*

13  *Corp.*, 104 F.T.C. 280, 411 n.60 (1984).  Kaiser's casual mixing of cases and

14  discussions concerning market power under Section 1 and monopoly power under

15  Section 2 represents a fundamental obfuscation of the relevant authority.[2]

16  "Monopoly power under § 2 requires, of course, something greater than market

17  power under § 1."  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S.

18  451, 481, 112 S. Ct. 2072, 2090, 119 L. Ed. 2d 265 (1992).

19           *Eastman Kodak* is particularly instructive because that case involved

20  both a Section 1 claim and a Section 2 claim.  The Supreme Court first held that

21  there was sufficient direct evidence to sustain a showing of market power under

22  Section 1.  *Id.* at 477-78.  Having done so, the Supreme Court went on to consider

23  the Section 2 claim.  The Court did not find that the same direct evidence was

---

24  [2]  In addition to the Section 1 cases discussed in the text, Kaiser relies on the

25  following Section 1 cases:  *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000);
    *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) (quoting another section 1 case,

26  *K.M.B. Warehouse. Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995);
    *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 209 (3d Cir. 1994) (section 1 tying

27  case); *see also United States v. Baker Hughes Inc.*, 908 F.2d 981, 992 (D.C. Cir.
    1990) (Clayton Act section 7 case which also requires only a showing of market

28  power).

ABBOTT'S OPPOSITION TO KAISER'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
CV-02-02443-JFW (FMOx)

1   sufficient to sustain a showing of monopoly power under Section 2.  Instead, the

2   Court found sufficient evidence of monopoly power under Section 2 *only* because

3   of additional evidence — the fact that the defendant had an overwhelming share in

4   the relevant market — of the precise sort that Kaiser has not put forward here.  *Id.*

5   at 481 ("Respondents' evidence that Kodak controls nearly 100% of the parts

6   market and 80% to 95% of the service market, with no readily available substitutes,

7   is, however, sufficient to survive summary judgment under the more stringent

8   monopoly standard of § 2.").

9           In *Thurman*, the Ninth Circuit similarly recognized the relevance of

10  the distinction between Section 1 and Section 2.  The Ninth Circuit first held that

11  "Proving injury to competition [under Section 1] ordinarily requires the claimant to

12  prove the relevant geographic and product markets and to demonstrate the effects of

13  the restraint within those markets."  Avoiding the need for such elaborate market

14  analysis requires the claimant to show actual detrimental effects on competition

15  such as output decreases or price increases caused by the restraint."  *Thurman*, 875

16  F.2d 1373 (citing, inter alia, *Ind. Fed'n*, 476 U.S. at 460).  The Ninth Circuit then

17  went on to note that, because *Thurman* involved both a Section 1 claim and a

18  Section 2 claim, "defining the relevant market is indispensable to a monopolization

19  claim."  *Id.*[3]

20          Therefore, and notwithstanding the casual language in some cases as

21  discussed below, it is particularly inapposite for Kaiser to take a sentence in a

22  Section 1 Supreme Court case like *Jefferson Parish*, to the effect that, "*market

23  power* exists whenever prices can be raised above the levels that would be charged

---

[3] *Accord In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536
F. Supp. 2d 1129, 1138 (N.D. Cal. 2008) ("In the section 2 context, the definition of
the relevant market is critical to the success of a claim on the merits, as a successful
section 2 claim is dependent upon proof of the relevant product market and
geographic market.  *See, e.g., Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447,
459, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993); *United States v. Grinnell Corp.*, 384
U.S. 563, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966).  This is simply not an issue in a
section 1 price-fixing case such as the one at bar.").

1    in a competitive market" (466 U.S. at 27 n.46) (emphasis added), and present the

2    cases as holding that "*monopoly power* 'exists whenever prices can be raised above

3    levels that would be charged in a competitive market.'"  Kaiser Motion at 12:19-20

4    (emphasis added).  Kaiser engages in the same legerdemain with respect to *NCAA*

5    *v. Board of Regents.  Compare NCAA*, 468 U.S. at 109 n.38 ("*Market power* is the

6    ability to raise prices above those that would be charged in a competitive market.")

7    (emphasis added) with Kaiser Motion at 12:17-18 (parenthetically describing

8    *NCAA* as stating that "*monopoly power* is 'the ability to raise prices above those

9    that would be charged in a competitive market'.") (emphasis added).

10        Kaiser does cite a group of cases suggesting that monopoly power

11   could be shown in a Section 2 case by so-called "direct evidence," without proof of

12   a relevant market.  These suggestions are contrary to actual holdings of the

13   Supreme Court and the Ninth Circuit.  With one exception the suggestions are all

14   *dicta*, and each court recites the supposed possibility of using direct evidence

15   without market definition only to acknowledge that in the case at bar direct

16   evidence has not been proffered or for some other reason need not be considered.

17   None of the *dicta* in these cases includes a rigorous analysis of the issue that

18   actually grapples with the Supreme Court and Ninth Circuit authority to the effect

19   that market definition is essential in a Section 2 case.

20        The one exception is the Sixth Circuit's decision in *Re/Max Int'l, Inc.*

21   *v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), and that decision is instructive.

22   In finding that direct evidence might suffice, the Sixth Circuit relied upon the same

23   dicta that Kaiser cites, as well as two of the Supreme Court cases discussed above

24   — *Indiana Fed'n of Dentists* and *Eastman Kodak.*  Of course, *Indiana Fed'n* was a

25   Section 1 case.  And although *Eastman Kodak* arose under both Section 1 and

26   Section 2, the Supreme Court expressly distinguished the *market* power analysis

27   under Section 1 from the *monopoly* power analysis under Section 2, finding the

28   direct evidence sufficient to sustain a finding of market power for Section 1

1   purposes but not finding that evidence sufficient for purposes of monopoly power

2   under Section 2.

3          Further, there are important economic reasons why proof of a relevant

4   market — rather than so-called "direct evidence" — must be shown in a Section 2

5   case.  As noted, monopoly power under Section 2 is much further on the continuum

6   than market power under Section 1.  But "direct effects" evidence cannot

7   differentiate between the two.  To quote the Supreme Court in *Walker Process* once

8   again, "[w]ithout a definition of that market there is no way to measure

9   [defendant's] ability to lessen or destroy competition." *Walker Process*, 382 U.S. at

10  177-178.  As the Ninth Circuit likewise held in *Image Technical Services*, *Inc.* (on

11  remand from the Supreme Court)*,* "[w]ithout a proper definition of the relevant

12  market, it is impossible to determine a party's influence over that market." *Image*

13  *Technical Services*, *Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1203 (9th Cir.

14  1997) (citation omitted).

15         In its moving papers, Kaiser omits any attempt whatsoever to define

16  the relevant market.  Accordingly, Kaiser's motion for partial summary judgment

17  on the issue of monopoly power must be denied at the threshold.[4]

18      **B.    Kaiser's Motion Fails Because Abbott Has Presented**

19             **Overwhelming Evidence That It Lacked Monopoly Power.**

20         In Section II above and in its own motion for summary judgment,

21  Abbott has outlined overwhelming evidence showing that Abbott lacked monopoly

22  power.  *E.g.*, SGI ¶¶ 55-62, 68-71, 74, 76-78, 86-90.  Abbott's evidence shows that

23  Hytrin competed based upon price with other drugs in the therapeutic class of

24  alpha-blockers.  SGI ¶¶ 62, 64-65, 68-69.  Abbott's evidence shows that the

25  presence of these other alpha-blockers — which constituted more than 50 percent

26

27  _____

    [4] As set forth in Abbott's motion for summary judgment, the market definition
    proposed by Kaiser's expert in any event fails as a matter of law and certainly is not
28  uncontroverted.

1   of the relevant market — constrained the price that Abbott could charge for Hytrin.

2   SGI ¶¶ 70-74.  And Abbott's evidence shows that Abbott never restricted its output

3   of Hytrin.  *See, e.g.*, SGI ¶¶ 69, 71, 76.  In its pending motion, Abbott demonstrated

4   that it is entitled to summary judgment in light of this evidence and the holes in the

5   supposed evidence on which Kaiser relies.  Those arguments and authorities will

6   not be repeated here, because here Abbott must show at most that there is some

7   evidence of the lack of monopoly power, not that such evidence is conclusive.

8         Despite the fact that Kaiser bears the burden of proof, Kaiser's motion

9   does not discuss any of this evidence.  Instead, Kaiser's motion proceeds based

10  upon the premise that if there are undisputed facts that might constitute some direct

11  evidence that Abbott engaged in any level of supra-competitive pricing of its

12  product, that evidence must be taken as *conclusive* on the issue of monopoly power.

13  Kaiser Motion at 14:23-15:8.

14        The section that follows addresses Kaiser's suggestion that the

15  supposed evidence that it has presented could be sufficient, in the absence of

16  contrary evidence, to support summary judgment.  But the Court need not reach that

17  issue because there is no support whatsoever for Kaiser's premise that Abbott

18  should be prohibited from using evidence of additional relevant facts to

19  demonstrate a genuine issue as to monopoly power.  No authority is cited for this

20  extraordinary proposition.  Kaiser does not contend that even a single one of its

21  cases supports the argument that direct evidence of monopoly power — if it is even

22  an acceptable substitute for evidence of market share in a relevant market — is

23  conclusive and cannot be countered with other evidence of a *lack* of monopoly

24  power.  In all of the cases that Kaiser cites on the subject of "direct evidence," none

25  is presented as even suggesting that, if there is some direct evidence of monopoly

26  power, the court must blind itself to the other relevant evidence.  Even if the

27  underlying facts on which Kaiser relies are uncontroverted, this does not mean that

28

ABBOTT'S OPPOSITION TO KAISER'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
CV-02-02443-JFW (FMOx)

1  those are the only facts that are relevant to the question of monopoly power.[5]

2         Indeed, here, Abbott has presented more than "indirect" evidence of a

3  lack of monopoly power. Abbott's evidence is not just that it has a low market

4  share in the relevant market. Abbott also has direct evidence that it lacks monopoly

5  power. The Ninth Circuit case law that discusses direct evidence (again, only to

6  point out that there is no such direct evidence of monopoly power in those cases),

7  defines "direct evidence" as evidence regarding whether the defendant, "by

8  restricting its own output, . . . can restrict *marketwide output* and, hence, increase

9  *marketwide prices*" to supra-competitive levels. *Rebel Oil*, 51 F.3d at 1434

10  (emphases added). Abbott's evidence, recounted above, includes evidence that

11  (pre-generic entry) Abbott had to engage in discounting to get Hytrin included in

12  formularies or otherwise obtain business. SGI ¶ 69. The analysis of Kaiser's own

13  expert Dr. Berndt shows that output of terazosin was higher before generic entry

14  (during the alleged monopoly period) than after generic entry (during the alleged

15  period of free competition). SGI ¶¶ 74, 76. This is direct evidence of a lack of

16  monopoly power.

17         In short, even if Kaiser's supposed "direct evidence" could support a

18  finding of monopoly power without proof of a relevant market (which it cannot, as

19  discussed in Subsections A and C herein), Kaiser's still would not be entitled to

20  summary judgment in its favor on the issue of monopoly power.

21

22

23  _____
[5] The authority discussed elsewhere in this Opposition shows that a plaintiff's so-
24  called direct evidence cannot overcome judgment as a matter of law in the
     defendant's favor on monopoly power unless the plaintiff's direct evidence is
25  "conclusive." *See Remeron*, 367 F. Supp. 2d at 383 (citing cases). In other words,
     direct evidence of monopoly power must be unambiguous before a court will allow
26  such evidence to defeat a defendant's motion for summary judgment. It would be a
     gross misuse of the case law to attempt to use these holdings to argue that
27  unambiguous evidence (if it did exist, which it does not here) cannot be
     controverted by other relevant evidence. Indeed, courts routinely instruct juries that
28  circumstantial evidence can be just as good as direct evidence.

C.    **The Case Law Rejects the Argument That Generic Drug's Price Effects in the Market Are Direct Evidence of Monopoly Power.**

Kaiser's motion should be denied not just on the bases that Kaiser fails to prove a relevant market and that Abbott has presented evidence that it lacked monopoly power.  Kaiser's motion should be denied on the additional basis that the supposed evidence on which Kaiser relies does not support a finding of monopoly power.  In *Remeron*, the court considered and rejected the same argument that Kaiser makes here.  The *Remeron* plaintiffs argued that "because Organon's brand name price was much greater than the subsequent generic price for mirtazipine, Organon necessarily had monopoly power prior to generic entry." *In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 681 (D.N.J. 2005).  The district court rejected the plaintiffs' argument, noting that the plaintiffs provided "no evidence of excessive price-cost margins or restricted output but merely rely on the fact that later generic manufacturers could enter the market more cheaply than Remeron's price in order to establish monopoly power." *Id.* at 682.  In words equally applicable here, the *Remeron* court held that was not enough because:

> the Defendant here is a brand name (not generic) manufacturer whose initial fixed costs (including research, development, and the cost of being the first to gain FDA drug approval) are significantly higher than those of generic manufacturers because the Hatch-Waxman Act allows generic manufacturers to gain much of the benefit of a brand name manufacturer's initial fixed costs by filing an ANDA.

*Id.*  The court noted that plaintiff's position "would render most brand name pharmaceutical companies as *per se* monopolists prior to generic entry." *Id.* at 683.

This reasoning is dispositive of Kaiser's argument here.[6]  The logic

---

[6] While Kaiser also references Abbott's agreements with Geneva and Zenith, those agreements reflect nothing of relevance additional to the fact (found to be insufficient by the *Remeron* and *Geneva* decisions) that generic drug companies' business model is to capture market share by entering the market at prices significantly lower than the prices previously charged in the market.

that the *Remeron* plaintiffs advanced, and that Kaiser is advancing, would lead not only to treating every branded pharmaceutical as a "monopoly" but to treating most branded products as "monopolies." A painkiller like *Tylenol* would be treated as a "monopoly" because generic acetaminophen is significantly cheaper. In *Remeron*, the court both denied the plaintiffs' motion for summary judgment on the issue of monopoly power, and granted the defendant's motion for summary judgment on the Section 2 claim.

Kaiser's assertion that the cost of generic terazosin, which reflects largely the marginal cost of production, is the "competitive" price for Hytrin is economically and legally baseless. Kaiser's Prof. Berndt himself admits that the pricing difference between brand-name drugs and generics reflects not supra-competitive pricing but that generics do not incur the substantial R&D expenses of companies like Abbott. *See supra* Section II; *see also* SGI ¶ 78. This concession is fatal to any argument that monopoly power can be proven by the fact that generic terazosin cost less than Hytrin. In any event, Kaiser's motion fails because Kaiser has not provided affirmative evidence regarding Abbott's cost structure. *Remeron*, 367 F. Supp. 2d at 683 ("The Plaintiffs' one-track focus on the price of Remeron compared to the price of generic mirtazipine says nothing about the most important factors that would allow a reasonable juror to conclude that Organon had monopoly power."); *Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) ("[A] reasonable finder of fact cannot infer monopoly power just from higher prices — the difference may reflect a higher quality more costly to provide — and it is always treacherous to try to infer monopoly power from a high rate of return.").[7]

The Areeda treatise uses the example of movies, another product

_____

[7] Here, in addition to the R&D expense that made Hytrin more costly for Abbott to provide, prior to generic entry Abbott spent significant sums promoting Hytrin, another expense that the generic companies generally do not carry and the cost of which Abbott had to build into the price of Hytrin. SGI ¶ 88.

1  requiring a substantial upfront investment but which can be reproduced at a much

2  lower marginal cost of production.  It is nonsensical to argue that the short-term

3  marginal cost of manufacturing a DVD of *Titanic*, say $2, is the "competitive price"

4  for *Titanic* DVDs.  When movie studios sell DVDs for $20, ten times the price at

5  which a "generic" knock-off might sell, that is not evidence of supra-competitive

6  pricing or monopoly power, but rather reflects the hundreds of millions of dollars

7  invested in making movies.  *See* 1 Hovenkamp et al., IP and Antitrust §4.1c (2004).

8  The same is true for pharmaceuticals.

9           Finally, to show directly that Abbott was exercising monopoly power,

10  Kaiser would need evidence not only of supra-competitive prices but also of

11  reduced output.  In *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997),

12  the Ninth Circuit rejecting a finding of monopoly power despite purported direct

13  evidence of the sort that the defendant hospital "routinely charged higher prices

14  than other hospitals while reaping high profits."  The Ninth Circuit held that,

15  "[w]ith no accompanying showing of restricted output, however, the plaintiffs have

16  failed to present direct evidence of market power."  *Id.*  Once again and far from

17  making a showing of restricted output here, Kaiser's own expert Dr. Berndt

18  prepared an analysis showing that Abbott did not reduce output before generic

19  entry.  Rather output was *higher* in the supposed "monopoly phase" before generic

20  entry.  SGI ¶¶ 74, 76.

21           Kaiser also has cited no case law or evidence of any sort supporting

22  the idea that meeting or beating a discounter's price to a bulk purchaser is evidence

23  of monopoly power.  To continue the analogies cited above, *Tylenol* would not

24  become a monopoly product merely because it was offered at a substantial discount

25  to large customers with significant bargaining power (like Kaiser).  Kaiser's

26  argument is nothing more than another way to say that brand-name pioneer drugs

27  are normally priced higher than generic drugs, *i.e.*, higher than the short-run cost of

28  manufacturing.  Kaiser has cited literally *nothing* in support of its argument.  Kaiser

1   has not even presented a supporting opinion from its economics expert.[8]  As in

2   *Remeron,* Kaiser's supposed "direct evidence" is insufficient.

3   **IV.    CONCLUSION**

4        For each of the foregoing reasons, and the reasons stated in Abbott's

5   discussion of monopoly power in its own motion for summary judgment, the Court

6   should deny Kaiser's current motion for partial summary judgment on the element

7   of monopoly power.

8   DATED:  September 11, 2009                 MUNGER, TOLLES & OLSON LLP

9

10

11                                             By:    */s/ Stuart N. Senator*
                                                      STUART N. SENATOR

12                                             Attorneys for Defendant
                                               ABBOTT LABORATORIES
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   ———————————————
     [8] It would obviously be inappropriate for Kaiser to use its reply papers to try to cure
28   its failure to carry its evidentiary burden.

8789016.1                        - 19 -          ABBOTT'S OPPOSITION TO KAISER'S MOTION
                                                   FOR PARTIAL SUMMARY JUDGMENT
                                                        CV-02-02443-JFW (FMOx)