BLANK ROME LLP
ANN B. LAUPHEIMER (*Pro Hac Vice*)
laupheimer@blankrome.com
JOSEPH M. PROFY (*Pro Hac Vice*)
profy@blankrome.com
130 North 18th Street
Philadelphia, Pennsylvania 19103-6998
Telephone:  215.569.5500
Facsimile:  215.569.5555

BLANK ROME LLP
W. SCOTT SIMMER (*Pro Hac Vice*)
simmer@blankrome.com
HARDY VIEUX (*Pro Hac Vice*)
vieux@blankrome.com
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Telephone:  202.772.5800
Facsimile:  202.772.5858

Attorneys for Plaintiff
KAISER FOUNDATION HEALTH PLANS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KAISER FOUNDATION HEALTH PLAN, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>        Defendant, | CASE NO. CV 02-02443-JFW (FMOx)<br><br>**KAISER'S OPPOSITION MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  October 5, 2009<br>Time:  1:30 p.m.<br>Place: Courtroom 16<br><br>Pretrial Conference Date: January 8, 2010<br>Trial Date:           January 26, 2010 |

130047.00601/21814292v.2

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT .............................................................................................................4

I.   As a Direct Purchaser, Kaiser Has Standing to Assert A Walker Process
     Claim under Section 2 of the Sherman Antitrust Act. ............................................4

II.  Kaiser's Walker Process Claim is Not Time-Barred. ...........................................11

     A.   Abbott Cannot Meet the Burden of Proof for Its Statute of Limitations
          Defense without Affirmatively Stating the Particular Date on Which Abbott
          Contends Kaiser's Claim Accrued. ............................................................11

     B.   The Statute of Limitations Applicable to Kaiser's Claim Was Tolled through
          the Earlier Filing and Maintenance of a Class Action in which Kaiser Was a
          Class Member. ....................................................................................12

     C.   Kaiser's Complaint Alleged a Walker Process Claim, as the Ninth Circuit
          Recognized When It Remanded that Claim for Trial. ........................................14

          1.   Walker Process Fraud Is Inherent to the Section 2 "Sham" Litigation
               Claims in Kaiser's March 22, 2002 Complaint. ....................................14

          2.   Abbott Has Waived Any Argument Concerning the Purported Effect
               of the "Bill of Particulars" on the Timeliness of Kaiser's Walker
               Process Claim. ....................................................................14

          3.   The "Bill of Particulars" Was Not an Amended Pleading, and Must Be
               Read in Conjunction with Kaiser's Complaint. ....................................16

          4.   Kaiser Filed Suit within Four Years of the Last Date on Which It Was
               Forced to Pay a Supracompetitive Price for Hytrin. ..............................17

III. Abbott's Market-Definition and Market-Share Analysis Requires the
     Jury's Resolution of Disputed Issues of Fact and Is Irrelevant Because
     There Is Undisputed Direct Evidence that Abbott Charged
     Supracompetitive Prices for Hytrin and Suppressed Generic Terazosin
     from Entering the Market. ........................................................................21

     A.   Direct Evidence of Abbott's Monopoly Power Obviates the Need to Pursue an
          Indirect Analysis and Establishes Abbott's Monopoly Power as a Matter of
          Law. ....................................................................................23

     B.   Hytrin Had No Economic Substitute Prior to Generic Terazosin, and the
          Relevant Market is at the Molecule Level ....................................................25

     C.   Abbott's Alleged R&D Costs Did Not Affect the Price for Hytrin and Are, in
          Any Event, Irrelevant. ........................................................................29

130047.00601/21814292v.2

D.    Abbott's Offer to Reduce the Price of Hytrin Occurred because Introduction of the Generic Eliminated Abbott's Ability to Price Hytrin at Supracompetitive Levels. ...............................................................................31

CONCLUSION ...............................................................................32

130047.00601/21814292v.2

**MEMORANDUM OF POINTS AND AUTHORITIES**

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

Al George, Inc. v. Envirotech Corp.,
    939 F.2d 1271 (5th Cir. 1991)........................................................ 18

5

6

Am. Tobacco Co. v. United States,
    328 U.S. 781 (1946)................................................................... 23

7

8

Amarel v. Connell,
    102 F.3d 1494 (9th Cir. 1996)...................................................... 10

9

American Pipe & Constr. Co. v. Utah,
    414 U.S. 552-56 (1974)........................................................ 12, 14

10

11

Asahi Glass Co. v. Pentech Pharms., Inc., 289 F. Supp. 2d 986, 989-91 (N.D.
    Ill. 2003).............................................................................. 8

12

13

Aspilaire v. Wyeth Pharms., Inc.,
    612 F. Supp. 2d 289 (S.D.N.Y. 2009)............................................ 19

14

15

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,
    459 U.S. 519 (1983)................................................................... 5

16

17

Baxter v. A.R. Baron & Co., Inc.,
    No. 94-3913, 1996 U.S. Dist. LEXIS 15098 (S.D.N.Y. Oct. 11, 1996)............ 17

18

19

Berkey Photo, Inc. v. Eastman Kodak Co.,
    603 F.2d 263 (2d Cir. 1979).............................................. 5, 18, 21

20

21

Blue Shield of Va. v. McCready,
    457 U.S. 465 (1982)................................................................... 5

22

23

Broadcom Corp. v. Qualcomm Inc.,
    501 F.3d 297 (3d Cir. 2007)........................................................ 24

24

25

Brown Shoe Co. v. United States,
    370 U.S. 294 (1962)................................................................... 4

26

27

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
    429 U.S. 477 (1977)................................................................... 4

28

Byars v. Bluff City News Co.,
    609 F.2d 843 (6th Cir. 1979)......................................................................... 24

Conwood Co. L.P. v. U.S. Tobacco Co.,
    290 F.3d 768 (6th Cir. 2002)........................................................................ 23

David Orgell, Inc. v. Geary's Stores, Inc.,
    640 F.2d 936 (9th Cir. 1981)........................................................................ 19

Eastman Kodak, 603 F.2d at 295 ....................................................................... 20

Eastman Kodak Co. v. Image Tech. Servs.,
    504 U.S. 451 (1992)...................................................................................... 28

Finwall v. City of Chicago,
    490 F. Supp. 2d 918 (N.D. Ill. 2007) ........................................................... 13

FTC v. Indiana Fed'n of Dentists,
    476 U.S. 447 (1986)...................................................................................... 24

Glen Holly Entm't, Inc. v. Tektronix, Inc.,
    352 F.3d 367 (9th Cir. 2003)........................................................................ 10

Grubka v. WebAccess Int'l, Inc.,
    No. 05-2483, 2006 U.S. Dist. LEXIS 62350 (D. Colo Aug. 31, 2006)............. 13

Harris v. City of Fresno,
    625 F. Supp. 2d 983 (E.D. Cal. 2009)........................................................... 19

Illinois Brick Co. v. Illinois,
    431 U.S. 720 (1977) ........................................................................................ 5

Illinois Tool Works Inc. v. Independent Ink, Inc.,
    547 U.S. 28 (2006)........................................................................................ 26

Image Technical Services, Inc. v. Eastman Kodak Co.,
    125 F.3d 1195 (9th Cir. 1997 ................................................................. 23, 24

In re Abbott Labs. Norvir Anti-trust Litig.,
    552 F. Supp. 2d 1080 (N.D. Cal. 2008) ........................................................ 23

In re Cardizem CD Antitrust Litig.,
    105 F. Supp. 2d 618 (2000)......................................................................... 30

MEMORANDUM OF POINTS AND AUTHORITIES

In re Ciprofloxacin Hydrochloride Antitrust Litig.,
   363 F. Supp. 2d 514 (E.D.N.Y. 2005) .............................................................. 8

In re DDAVP Direct & Indirect Purchaser Antitrust Litig.,
   2006 U.S. Dist. LEXIS 96201 (S.D.N.Y. 2006).................................................. 9

In re Enron Corp. Securities, Derivative & "ERISA" Litig.,
   465 F. Supp. 2d 687 (S.D. Tex. 2006) ............................................................ 13

In re Hanford Nuclear Reservation Litig.,
   534 F.3d 986 (9th Cir. 2008)................................................................. 12, 14

In re K-Dur Antitrust Litig.,
   2007 WL 5297755 (D.N.J. Mar. 1, 2007)........................................................ 8

In re Multidistrict Vehicle Air Pollution,
   591 F.2d 68 (9th Cir. 1979)) ........................................................................ 19

In re Netflix Antitrust Litig.,
   506 F. Supp. 2d 308 (N.D. Cal. 2007) ..................................................... passim

In re Remeron Antitrust Litig.,
   335 F. Supp. 2d 522 (D.N.J. 2004) ............................................................. 7, 9

Jenson v. Allison-Williams Co.,
   No. 98-2229, 1999 U.S. Dist. LEXIS 22170 (S.D. Cal. Aug. 23, 1999)........... 12

Kaiser Foundation Health Plan Inc. v. Abbott Labs., Inc.,
   552 F.3d 1033 (9th Cir. 2009)...................................................................... 11

Klehr v. A.O. Smith Corp.,
   521 U.S. 179 (1997)..................................................................................... 20

Korody-Colyer Corp. v. Gen. Motors Corp.,
   828 F.2d 1572 (Fed. Cir. 1987)..................................................................... 18

Ledbetter v. Goodyear Tire & Rubber Co.,
   550 U.S. 618 (2007)..................................................................................... 19

Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.,
   275 F.3d 762 (9th Cir. 2001)......................................................................... 27

Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.,
   402 F. Supp. 2d 276 (D.D.C. 2005) ....................................................... passim

**MEMORANDUM OF POINTS AND AUTHORITIES**

Pace Indus., Inc. v. Three Phoenix Co.,
    813 F.2d 234 (9th Cir. 1987)................................................................. 18, 20

Re/Max Int'l, Inc. v. Realty One, Inc.,
    173 F.3d 995 (6th Cir. 1999)................................................................. 24

Rebel Oil Co. v. Atlantic Richfield Co.,
    51 F.3d 1421 (9th Cir. 1995)................................................................. 23, 24

SmithKline Corp. v. Eli Lilly & Co.,
    575 F.2d 1056 (3d Cir. 1978)................................................................. 28

Tosti v. City of Los Angeles,
    754 F.2d 1485 (9th Cir. 1985)................................................................. 12, 13, 14

Toys "R" Us, Inc. v. FTC,
    221 F.3d 928 (7th Cir. 2000)................................................................. 24

Tunis Bros. Co., Inc. v. Ford Motor Co.,
    952 F.2d 715 (3d Cir. 1991)................................................................. 22

U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,
    7 F.3d 986 (11th Cir. 1993)................................................................. 22, 26

United States v. Aluminum Co. of America,
    148 F.2d 416 (2d Cir. 1945)................................................................. 27

United States v. Visa USA, Inc.,
    163 F. Supp. 2d 302,336 (S.D.N.Y. 2001)................................................ 25

Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.,
    382 U.S. 172 (1965)................................................................. passim

Zenith Radio Corp. v. Hazeltine Research, Inc.,
    401 U.S. 321 (1971)................................................................. 18

**STATUTES**

15 U.S.C. § 15 ................................................................. 4

15 U.S.C. § 15b ................................................................. 17

MEMORANDUM OF POINTS AND AUTHORITIES

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY at p. 114 (6th ed. 1991) .............................................. 17

Federal Rule of Civil Procedure 56............................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES

1    **OPPOSITION MEMORANDUM OF POINTS AND AUTHORITIES**

2        Plaintiff Kaiser Foundation Health Plan, Inc., on behalf of itself, its

3    subsidiaries, and Kaiser Foundation Hospitals (collectively, "Kaiser") and pursuant to

4    Federal Rule of Civil Procedure 56 and Local Rule 7-5, respectfully submits this

5    Memorandum in Opposition to Abbott's Motion for Summary Judgment.

6    **PRELIMINARY STATEMENT**

7        More than nine years ago a class action was filed against Defendant Abbott

8    Laboratories ("Abbott"), premised, in part, on Abbott's fraudulent conduct before the

9    Patent and Trademark Office ("PTO") in prosecuting United States Patent No.

10    5,504,207 ("'207 Patent"). (SF[1] ¶¶ 150-152.) Less than two years later—and more

11    than seven years ago—on March 22, 2002 Kaiser filed its Complaint against Abbott

12    alleging, among other claims, a claim under Section 2 of the Sherman Antitrust Act

13    ("Sherman Act") premised on the invalidity of the '207 Patent and Abbott's

14    enforcement of the fraudulently-obtained '207 Patent against generic manufacturers of

15    generic terazosin hydrochloride, the active ingredient in Abbott's brand-name Hytrin

16    ("terazosin"). (SF ¶¶ 154-155; AUF ¶ 41.)

17        Abbott defrauded the PTO and sought to enforce the fraudulently-obtained '207

18    Patent so that it could maintain its supracompetitive prices for Hytrin and suppress

19    generic manufacturers from coming to market with generic terazosin. (AUF ¶¶ 10-11,

20    14, 19, 21-38, 41; SF ¶¶ 151, 153, 155, 157.) The result of Abbott's illegal conduct

21    was the delayed entry of generic terazosin into the market, causing direct purchasers,

22    such as Kaiser, to pay supracompetitive prices for terazosin until the Federal Circuit

23    declared the '207 Patent invalid and Geneva Pharmaceuticals ("Geneva") entered the

24    market with generic terazosin in August 1999. (Id.)

25    ------

    [1] "SF" refers to Kaiser's Statement of Genuine Issues of Material Fact, filed

26    concurrently with this Memorandum. "AUF" refers to the Additional Undisputed
Facts included within the Statement of Uncontroverted Facts and Conclusions of law

27    filed with Kaiser's Motion for Partial Summary Judgment.
130047.00601/21814292v.2

28

1    Now more than seven years into this litigation, Abbott seeks summary

2  judgment on three grounds:

3    I.    Abbott seeks summary judgment on the basis that direct purchasers (such

4  as Kaiser) do not have standing to assert <u>Walker Process</u> claims under Section 2 of the

5  Sherman Act.  Although this particular question has not yet been decided by the

6  Federal Circuit or any other Circuit Court of Appeals, multiple district courts,

7  including the United States District Court for the Northern District of California, have

8  held that direct purchasers have standing to assert Section 2 claims premised on

9  <u>Walker Process</u> fraud.  Abbott argues otherwise based on non-binding authority that

10  fails to apply traditional antitrust standing principles and, in most cases, concerns

11  <u>Walker Process</u> claims brought by parties other than direct purchasers.

12    II.    Abbott argues that Kaiser's <u>Walker Process</u> claim is barred by the four-

13  year statute of limitations applicable to Sherman Act Section 2 claims.  Predictably,

14  Abbott recycles arguments it previously advanced in summary judgment and appellate

15  briefing, contending that Kaiser's claim accrued before March 22, 1998 and that the

16  continuing violation exception to the four-year statute of limitations does not apply.

17  (SF ¶¶ 159-160.)  Regardless of the accrual rule or critical date offered by Abbott,

18  Kaiser's Complaint benefits from class action tolling and is, therefore, timely.  (SF ¶

19  150-152, 154.)  Even if Kaiser's Complaint does not benefit from class action tolling,

20  it is timely because Kaiser filed suit within four years of the last date on which it was

21  forced to pay Abbott's supracompetitive price for Hytrin and within four years of the

22  date on which its damages were no longer speculative, satisfying well-established

23  exceptions to the application of the four-year statute of limitations.  (SF ¶ 154.)

24    Besides these recycled arguments, Abbott now contends—without citation to

25  any authority and for the first time in over seven years of extensive litigation—that

26  Kaiser's Complaint does not even include a <u>Walker Process</u> claim and that the critical

27  date for statute of limitations purposes runs from the date of Kaiser's "Bill of

28

1  Particulars."[2]  Abbott's argument cannot be taken seriously, particularly in light of the

2  Ninth Circuit's determination that Kaiser's <u>Walker Process</u> claim must be decided by

3  a jury.  (AUF ¶ 51.)  Abbott has waived this contrived argument by repeatedly

4  admitting that the only critical date pertaining to the statute of limitations is March 22,

5  1998; by failing to object to the "Bill of Particulars" on such grounds after it was

6  submitted;[3] and by failing to advance this bizarre argument at any stage of this

7  litigation over the past seven years.  (SF ¶ 158-160.)

8       Moreover, Abbott is simply wrong.  Abbott's fraudulent conduct before the

9  PTO and during its prosecution of the '207 Patent inheres in Kaiser's "sham"

10  litigation claims concerning the '207 Patent and is adequately pleaded in Kaiser's

11  Complaint, without consideration of the "Bill of Particulars."  (SF ¶ 155.)  The "Bill

12  of Particulars" does nothing more than provide additional details of the claims already

13  set forth in Kaiser's Complaint, is not an amended or supplemental pleading, and, in

14  any event, must be read together with Kaiser's Complaint.  (SF ¶ 156.)  Abbott's

15  argument concerning the "Bill of Particulars" is a complete red herring.

16       III.    After previously arguing that its monopoly power in a defined market

17  was a matter rife with factual disputes and, thus, not the proper subject of a motion for

18  summary judgment, (SF ¶ 162), Abbott now argues that it is entitled to summary

19  judgment.  Abbott's motion should be denied for this reason alone.  More importantly,

20  however, it is not necessary for this Court to engage in a fact-driven analysis of the

21  market definition and Abbott's theoretical market share (factual determinations which

22  would usurp the role of the jury) because, as set forth fully in Kaiser's Motion for

23  Partial Summary Judgment, there is undisputed direct evidence that Abbott charged

24  _____

25  [2] Kaiser was ordered to submit the "Bill of Particulars" in connection with an October 8, 2003 status conference in the multi-district litigation in the United States District

26  Court for the Southern District of Florida ("MDL" or "MDL Court") to provide additional details regarding the claims already set forth in its Complaint.

27  [3] Abbott objected to the "Bill of Particulars" on other grounds not pertinent to its current position in connection with the statute of limitations.

28

1    supracompetitive prices for Hytrin and suppressed competitors from coming to market

2    with generic terazosin.  It is Kaiser, not Abbott, that is entitled to judgment as a matter

3    of law on Abbott's monopoly power before generic terazosin came to market in

4    August of 1999.

5        For these and the additional reasons set forth below, this Court should deny

6    Abbott's Motion for Summary Judgment and grant Kaiser's Motion for Partial

7    Summary Judgment.

8                    <u>**ARGUMENT**</u>

9    I.    **A**S A **D**IRECT **P**URCHASER, **K**AISER **H**AS **S**TANDING TO **A**SSERT **A** <u>**W**ALKER</u>

10         <u>**P**ROCESS</u> **C**LAIM UNDER **S**ECTION 2 OF THE **S**HERMAN **A**NTITRUST **A**CT.

11        Section 4 of the Clayton Act provides that "any person who shall be injured in

12    his business or property by reasons of anything forbidden in the antitrust laws may sue

13    therefor."  15 U.S.C. § 15.  Over forty years ago, the Supreme Court held that an

14    inventor who obtains a patent by defrauding the patent office deserves no immunity

15    from the antitrust laws and may be sued for what has come to be known as a <u>Walker</u>

16    <u>Process</u> claim.  <u>See</u> <u>In re Netflix Antitrust Litig.</u>, 506 F. Supp. 2d 308, 314 (N.D. Cal.

17    2007) (discussing <u>Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.</u>,

18    382 U.S. 172, 176 (1965)).  In <u>Walker Process</u>, the Supreme Court did not establish a

19    unique analysis or requirement for standing to assert such claims, and, thus, the

20    traditional test for antitrust standing applies.  <u>See</u> <u>Walker Process</u>, 382 U.S. at 174 &

21    179 (Harlan, J., concurring); <u>see also</u> <u>Netflix</u>, 506 F. Supp. 2d at 314-16; <u>see also</u>

22    <u>Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.</u>, 402 F. Supp. 2d 276, 285-

23    87 (D.D.C. 2005).

24        "The antitrust laws…were enacted for the 'protection of *competition*, not

25    *competitors*,'" <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488

26    (1977) (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 320 (1962))

27    (emphasis in original), and to "creat[e] an effective remedy for consumers who were

28

1  forced to pay excessive prices," <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State</u>

2  <u>Council of Carpenters</u>, 459 U.S. 519, 530 (1983). It is for this reason that direct

3  purchasers such as Kaiser have "elevate[ed]" standing to assert antitrust claims based

4  on overcharges and are, in fact, the "preferred" plaintiff. <u>See</u> <u>Illinois Brick Co. v.</u>

5  <u>Illinois</u>, 431 U.S. 720, 746 (1977); <u>see also</u> <u>Blue Shield of Va. v. McCready</u>, 457 U.S.

6  465, 474 (1982) (direct purchasers are the "group…most likely to press their claims

7  with the vigor that the § 4 treble-damages remedy was intended to promote"); <u>Berkey</u>

8  <u>Photo, Inc. v. Eastman Kodak Co.</u>, 603 F.2d 263, 298 (2d Cir. 1979) ("Excessive

9  prices, maintained through exercise of a monopolist's control of the market,

10 constituted one of the primary evils that the Sherman Act was intended to correct.

11 Where a monopolist acquired or maintained its power by anticompetitive conduct,

12 therefore, a direct purchaser may recover the overcharge caused by the violation of §

13 2.").

14     Notwithstanding Kaiser's status as a direct purchaser and preferred plaintiff, in

15 its motion, Abbott advances a nuanced argument concerning Kaiser's standing to

16 assert a <u>Walker Process</u> claim, stating that "Courts that have considered the antitrust

17 standing requirements for *Walker Process* claims in the Hatch-Waxman [Act] context

18 have consistently held that only competitors or parties sued or threatened with a patent

19 infringement suit have antitrust standing."[4] (Br. at 20.) Abbott offers no insight into

20 what "the Hatch-Waxman context" is or why it is of any significance. It is clear that

21 Abbott injects this limitation to downplay contrary law, including the law established

22 by the Supreme Court in <u>Walker Process</u>. <u>See, e.g.</u>, <u>Walker Process</u>, 382 U.S. at 174-

23 179; <u>Netflix</u>, 506 F. Supp. 2d at 314-16; <u>Molecular Diagnostics</u>, 402 F. Supp. 2d at

24 279-82.

25

26 [4] In prior summary judgment briefing, Abbott did not question whether Kaiser has
   standing to assert a <u>Walker Process</u> claim, which failure Abbott attributes to the

27 existence of a new "robust line of cases [that] did not then exist." (Br. at 20 n.8.)

28

Walker Process fraud arises in the context of any fraudulently-obtained patent, regardless of whether the patent is for a use, a method, a tool, or a chemical. Abbott fails to explain (because it cannot) what legal significance the Hatch-Waxman Act has with respect to Kaiser's standing to assert a Sherman Act Section 2 claim. Indeed, in the Supreme Court's succinct opinion in Walker Process, there is no limit on the types of patents to which its opinion applies or the class(es) of plaintiffs that may bring such suits.[5] Writing for the unanimous Court, Judge Clark noted:

> We have concluded that the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present. In such event the treble damages provisions of § 4 of the Clayton Act would be available to *an injured party*.

Walker Process, 382 U.S. at 174 (emphasis added). Writing a concurring opinion simply to "add a few comments," Justice Harlan noted:

> We hold today that a treble-damage action for monopolization which, but for the existence of a patent, would be violative of § 2 of the Sherman Act may be maintained under § 4 of the Clayton Act if two conditions are satisfied: (1) the relevant patent is shown to have been procured by knowing and willful fraud practiced by the defendant on the Patent Office or, if the defendant was not the original patent applicant, he had been enforcing the patent with knowledge of the fraudulent manner in which it was obtained; and (2) all the elements otherwise necessary to establish a § 2 monopolization charge are proved.

Walker Process, 382 U.S. at 179 (J. Harlan, concurring). The Supreme Court's opinion could not be clearer in its scope. Yet the cases on which Abbott relies suffer from the same defective reading of the Supreme Court's decision in Walker Process.

Significantly, multiple courts, including another district court in California, have held that direct purchasers have standing to bring a Section 2 claim premised on Walker Process fraud. See, e.g., Netflix, 506 F. Supp. 2d at 314-16; Molecular Diagnostics, 402 F. Supp. 2d at 279-82. In Molecular Diagnostics, the direct

---

[5] Nor has Abbott cited to any legislative history or any portion of the Hatch-Waxman Act to support its position that Walker Process claims "in the Hatch-Waxman context" (whatever that means) are to be treated differently than claims based on patents not "in the Hatch-Waxman context."

1  purchaser plaintiff argued that the defendants, which produced, sold, and distributed

2  the enzyme purchased by plaintiff, used a patent procured by fraud to monopolize the

3  market for the enzyme.  402 F. Supp. 2d at 279.  Just as Abbott contends here, the

4  defendants argued that the plaintiff lacked standing because "the *Walker Process*

5  decision did not contemplate direct consumers as suitable plaintiffs in this type of

6  action" and that "the only entity with standing to bring a *Walker Process* claim is a

7  competitor or, more specifically, an entity against whom a fraudulently obtained

8  patent is, or could be, enforced."  Id.  In rejecting the defendants' arguments, the court

9  distinguished and criticized the decision in In re Remeron Antitrust Litig., 335 F.

10  Supp. 2d 522 (D.N.J. 2004), which Abbott relies on here:

> The holding [in *Remeron*] cites no controlling precedent, nor offers any compelling justification for its conclusion.
>
> The inclusion of the fact that the plaintiffs were not parties in the initial patent infringement suits suggests that the court confused the harm addressed through a *Walker Process* claim. The court appears to believe that, standing alone, the enforcement of the fraudulently procured patent is the relevant inquiry in a *Walker Process* claim, hence the court's assertion that a plaintiff must be an actual or potential competitor. This, however, is not the case. *Walker Process* claims are intended to address antitrust injury, thus the requirement that a plaintiff be able to allege a violation of Section 2 of the Sherman Act. A *Walker Process* claim is not a fraud claim, as the court intonates, but an antitrust violation. The harm is not the invalid patent, but the use of the invalid patent to establish a monopoly.
>
> Viewed properly as an antitrust claim, there is little reason to think that standing requirements for *Walker Process* claims differ from standing requirements in more conventional antitrust actions. As plaintiff notes, direct purchasers are generally recognized as having standing to prosecute antitrust claims.

23  Id. at 280-81 (internal citations and quotations omitted).

24       In addition to Remeron, Abbott cites (and mischaracterizes) several other

25  inapposite cases to support its position that, "in the Hatch-Waxman context," "only

26  competitors or parties sued or threatened with a patent infringement suit have antitrust

27  standing" to assert a Walker Process claim.  (See Br. at 20-21.)

28  130047.00601/21814292v.2                          7

1    Even Abbott distinguishes <u>In re K-Dur Antitrust Litig.</u>, 2007 WL 5297755

2    (D.N.J. Mar. 1, 2007), and <u>In re Ciprofloxacin Hydrochloride Antitrust Litig.</u>, 363 F.

3    Supp. 2d 514, 547 (E.D.N.Y. 2005), because they involved indirect purchasers

4    bringing state-law claims, not direct purchasers such as Kaiser bringing federal

5    <u>Walker Process</u> claims.  (Br. at 20 & n.7.)  In <u>Cipro</u>, the Court dismissed the indirect

6    purchaser plaintiff's state-law claims premised on a fraudulently-obtained patent,

7    holding that the claims were preempted by federal patent law.  363 F. Supp. 2d at 543

8    ("Whatever the reasons for indirect plaintiffs bringing Walker Process and sham

9    litigation claims under state law, those claims are preempted by federal patent law and

10    must, therefore, be dismissed.").  In addition to the fact that <u>K-Dur</u> involved indirect

11    purchasers, <u>K-Dur</u> is of no persuasive value because it is the decision of special

12    master in a report and recommendation that was appealed to the presiding judge by the

13    plaintiffs and was never adopted by the court.[6]  Furthermore, in that report and

14    recommendation, the Special Master distinguished the position of the direct purchaser

15    plaintiffs and expressly limited his holding regarding standing to the indirect

16    purchaser plaintiffs.  2007 WL 5297755 at *25-26.

17    In <u>Asahi Glass Co. v. Pentech Pharms., Inc.</u>, Judge Posner, who was sitting by

18    designation, held that the plaintiff lacked standing to assert claims under Section 1 and

19    Section 2 against a patentee, applying a traditional antitrust analysis.  289 F. Supp. 2d

20    986, 989-91 (N.D. Ill. 2003).  However, the plaintiff in <u>Asahi Glass</u> was a supplier

21    who supplied a component (the active ingredient) of the end product to one of the

22    defendant's competitors, which then manufactured and sold the end product (a pill),

23    not a direct purchaser of the end product.  <u>Id.</u> at 989, 990, 995 ("The general rule is

24    that suppliers do not have 'standing' (a word that is used in this context to denote the

25

26    _____

     [6] In <u>K-Dur</u>, the Special Master recommended that the state-law claims premised on a
     fraudulently-obtained patent were, as in <u>Cipro</u>, preempted by federal patent law.  <u>See</u>

27    <u>K-Dur</u>, 2007 WL 5297755 at *25.

28    <span style="font-size:smaller">130047.00601/21814292v.2</span>                    8

─────────────────────────────────────────

**MEMORANDUM OF POINTS AND AUTHORITIES**

1  right to sue rather than the existence of jurisdiction) to complain about a violation of

2  the antitrust laws at the customer level.").  Posner did not hold, as Abbott claims in its

3  parenthetical, that, "in the Hatch-Waxman context…*Walker Process* standing is

4  limited to competitors."  (Br. at 20.)

5       Although In re DDAVP Direct & Indirect Purchaser Antitrust Litig., 2006 U.S.

6  Dist. LEXIS 96201 (S.D.N.Y. 2006), involved direct purchaser plaintiffs, its analysis

7  mirrors the Remeron court's defective analysis, misreading the Supreme Court's

8  opinion in Walker Process and failing to apply traditional antitrust standing principles.

9  Perhaps significant, the ruling in DDAVP concerning the plaintiffs' standing to assert

10 Walker Process claims has been appealed to the United States Court of Appeals for

11 the Second Circuit, in which the Federal Trade Commission ("FTC") and Department

12 of Justice ("DOJ") and over forty states, including California, and U.S. territories have

13 filed *amicus* briefs in support of direct purchasers' standing.[7]

14       Although not mentioned by Abbott, the Northern District of California has

15 recently rejected each of the opinions on which Abbott relies and adopted the

16 reasoning of the Molecular Diagnostics court.  See Netflix, 506 F. Supp. 2d at 314-16.

17 In Netflix, direct purchasers of Netflix's rental DVDs sued Netflix alleging that

18 Netflix fraudulently procured a patent and enforced that patent in "sham" litigations

19 against its competitors, including Blockbuster.  Id. at 312-13.[8]  The direct purchasers

20 argued that "Netflix fraudulently obtained a patent, which it then used to keep

21 ───────────────────────

22 [7] See http://www.ftc.gov/os/2007/05/DDAVPCommission-DoJBrief.pdf (FTC and DOJ's *amicus* brief), last visited September 7, 2009;

23 http://www.naag.org/assets/files/pdf/antitrust.DDAVP-States-Amicus.pdf (states and U.S. territories' *amicus* brief), last visited on September 7, 2009.  The FTC and DOJ's filing of an *amicus* brief in support of the purchasers' standing to bring Walker

24 Process claims is notable considering that the United States also filed an *amicus* brief in connection with the appeal to the Supreme Court in Walker Process.  See Walker

25 Process, 382 U.S. at 250.

26 [8] In the separate infringement action brought by Netflix, Blockbuster raised a Walker Process counterclaim under Section 2 of the Sherman Act.  Netflix, 506 F. Supp. 2d at

27 313.

28

1   competitors out of the market" and that they "were injured by the monopolistic

2   overcharges Netflix could exact absent competition." Id. at 315. Netflix moved to

3   dismiss, contending that the direct purchasers lacked standing to bring Walker Process

4   claims and that the "fraud's true target was competitors, not consumers." Id. at 311-

5   12, 315-16. In rejecting Netflix's argument based on the same cases Abbott now

6   cites, the court applied a traditional antitrust standing analysis and held that *"the harm*

7   *in a Walker Process claim comes not from fraudulently obtaining a patent, it comes*

8   *from creating or maintaining an unlawful monopoly using that patent"* and that,

9   *"[e]ven though Walker Process claims are predicated on enforcement of a*

10  *fraudulently-obtained patent, the harm still accrues directly to consumers" because*

11  *"[c]ompetitors are excluded from the market."* Id. at 316 (emphasis added).

12        Here, Kaiser has standing to assert its Walker Process claim because it meets

13  the elements of the antitrust standing analysis in this Circuit. See id. at 315 (citing

14  Amarel v. Connell, 102 F.3d 1494, 1507 (9th Cir. 1996) (discussing five factors for

15  antitrust standing); Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 372 (9th

16  Cir. 2003) (discussing additional factors concerning "the nature of the plaintiff's

17  injury")). There is no question that Kaiser was injured by having to pay

18  supracompetitive prices Abbott was able to exact because it fraudulently obtained and

19  used the '207 Patent to suppress competitors from coming to market with generic

20  terazosin.

21        Abbott suggests that Kaiser is not a proper plaintiff for a Walker Process claim

22  because Abbott's competitors are "the ones best placed to evaluate whether Abbott's

23  patent prosecution was anticompetitive." (Br. at 21.) This argument is startling in

24  view of the fact that Abbott paid off the very competitors that it now contends are

25  better positioned to bring suit so that it could continue to charge supracompetitive

26  prices for Hytrin. It also disregards the well-recognized and unique harm suffered by

27  a direct purchaser such as Kaiser. As the Netflix and Molecular Diagnostics courts

28  130047.00601/21814292v.2                        10

1  noted, the injury sought to be remedied by a <u>Walker Process</u> claim brought by a direct

2  purchaser is the money the direct purchaser was overcharged as a result of the

3  anticompetitive conduct.  The harm, if any, sought to be remedied in a <u>Walker Process</u>

4  suit filed by a competitor is the competitor's lost profits.

5      Finally, and related to its argument that competitors make better plaintiffs,

6  Abbott contends that its competitors actually did bring suits concerning the invalidity

7  of the '207 Patent and suggests that the competitors abandoned those suits because

8  "the allegations were not worth pursuing." (Br. at 30.)  Perhaps the allegations were

9  "not worth pursuing" because Abbott was paying those generic competitors several

10  million dollars per month not to compete with Abbott.  Moreover, the Ninth Circuit

11  has determined that Abbott's conduct before the PTO and use of the '207 Patent to

12  suppress generic competition and continue to exact supracompetitive prices for Hytrin

13  are worthwhile enough to go to the jury.  <u>See</u> <u>Kaiser Foundation Health Plan Inc. v.</u>

14  <u>Abbott Labs., Inc.</u>, 552 F.3d 1033, 1036, 1053 (9th Cir. 2009) ("we hold that there is

15  sufficient evidence in the record to support a jury's conclusion"); (AUF ¶ 51).

16      In sum, Kaiser has standing, as a direct purchaser of Hytrin, to pursue its

17  <u>Walker Process</u> claim against Abbott.

18  **II.**   **KAISER'S <u>WALKER PROCESS</u> CLAIM IS NOT TIME-BARRED.**

19      **A.**   **Abbott Cannot Meet the Burden of Proof for Its Statute of**

20           **Limitations Defense without Affirmatively Stating the Particular**

21           **Date on Which Abbott Contends Kaiser's Claim Accrued.**

22      In its Motion, Abbott refuses to state the date on which it contends Kaiser's

23  <u>Walker Process</u> claim accrued.  Abbott's refusal amounts to a failure to meet the

24  burden of proving its affirmative defense.  Additionally, this Court cannot fully

25  consider Abbott's affirmative defense without knowing on what date Abbott contends

26

27

28  130047.00601/21814292v.2                    11

1    Kaiser's claim accrued.  For this reason alone, Abbott's motion for summary

2    judgment on grounds of the statute of limitations should be summarily denied.[9]

3    **B.**    **The Statute of Limitations Applicable to Kaiser's Claim Was Tolled**

4    **through the Earlier Filing and Maintenance of a Class Action in**

5    **which Kaiser Was a Class Member.**

6    Under Ninth Circuit law, commencement of a class action suspends the

7    applicable statute of limitations as to all putative class members.  In re Hanford

8    Nuclear Reservation Litig., 534 F.3d 986, 1008 (9th Cir. 2008), cert. denied, 129 S.

9    Ct. 762 (2008) (discussing American Pipe & Constr. Co. v. Utah, 414 U.S. 552-56

10   (1974)).  Specifically, the statute of limitations is tolled either until class certification

11   is granted or denied, or until the particular class member opts out of the putative class.

12   In re Hanford, 534 F.3d at 1008; see also Tosti v. City of Los Angeles, 754 F.2d 1485,

13   1488 (9th Cir. 1985).  The rationale behind this well-established rule is that "[s]tatutes

14   of limitations are intended to provide notice to defendants of a claim before the

15   underlying evidence becomes stale," and "the filing of a timely class action provides

16   defendants with notice of a claim, so a follow-on individual suit cannot surprise

17   defendants."  In re Hanford, 534 F.3d at 1009.  The individual action need not be

18   identical to the original class action:

19   no persuasive authority [exists] for a rule which would require
     that the individual suit must be identical in every respect to the
20   class suit [of limitations] to be tolled.  Such a rule
     would be illogical because one of the primary reasons a
21   member will opt out of a class suit is that she has strong
     individual claims against the defendant that she believes will
22   not be redressed by the overall class settlement.

23   Tosti, 754 F.2d at 1489; see also Jenson v. Allison-Williams Co., No. 98-2229, 1999

24   U.S. Dist. LEXIS 22170, at *14-15 (S.D. Cal. Aug. 23, 1999) ("[T]he individual

25   claims need only share a factual and legal relationship such that the defendant would

26

27   _____
     [9] Nor should this Court permit Abbott to cure this intentional omission in a reply brief.

28   130047.00601/21814292v.2                    12
     _____
     **MEMORANDUM OF POINTS AND AUTHORITIES**

1   likely rely on the same evidence or witnesses to put up its defense."); <u>Finwall v. City</u>

2   <u>of Chicago</u>, 490 F. Supp. 2d 918, 922-23 (N.D. Ill. 2007) ("For tolling to apply, the

3   claims from the class action do not need to be identical…substantial similarity is

4   enough."); <u>In re Enron Corp. Securities, Derivative & "ERISA" Litig.</u>, 465 F. Supp.

5   2d 687, 718-19 (S.D. Tex. 2006) ("subsequent individual claims…need not be

6   identical to the original class action's for tolling to apply as long as they share a

7   common factual basis and legal nexus so that the defendant would rely on the same

8   evidence and witnesses in his defense"); <u>Grubka v. WebAccess Int'l, Inc.</u>, No. 05-

9   2483, 2006 U.S. Dist. LEXIS 62350, at *2-4 (D. Colo Aug. 31, 2006) (applying class

10   action tolling to securities-based action under the Colorado Organized Crime Control

11   Act that was sufficiently related to factual allegations in previously-filed RICO class

12   action). Additionally, the plaintiff in the individual action need not have relied upon

13   the commencement of the class action or even be aware that it was filed in order to

14   benefit from class action tolling. <u>Tosti</u>, 754 F.2d at 1489 (quoting <u>American Pipe</u>, 414

15   U.S. at 551).

16       Here, in August of 2000, an amended class action complaint substantially

17   similar to Kaiser's Complaint was filed against Abbott based on, among other actions,

18   Abbott's unlawful enforcement of its fraudulently-obtained '207 Patent against its

19   competitors ("Class Action Complaint").[10] (SF ¶¶ 150-151.) Kaiser was a member of

20   the end-payor class as it was defined in the Class Action Complaint. (SF ¶ 152.)

21   Kaiser suffered damages from the point that a generic manufacturer could have

22

---

23 [10] Even earlier in the MDL proceedings, on August 23, 2000, a RICO Case Statement
was filed in connection with the Amended Complaint—the earlier pleading filed on

24 July 21, 2000. The RICO Case Statement, which is to be read in connection with the
Amended Complaint, provided that "Abbott knew that its illegal monopoly was made

25 possible by a number of felonies, including but not limited to…felony in the
procurement of Patent '207, when it represented that the chemical compound for

26 which it submitted its application was patentable, and failed to disclose material facts,
including the fact that the compound ha[d] been 'on sale' for over one year." (RICO

27 Case Statement at 4.)

28

1    entered the market—either Novopharm in November of 1996 or Geneva on March 30,

2    1998—until September of 1999, when Geneva entered the market with generic

3    terazosin.  Because the Class Action Complaint was filed in August of 2000, Kaiser's

4    "follow-on individual suit" is timely under the doctrine of class action tolling.  <u>See</u>

5    <u>generally</u> <u>American Pipe</u>, 414 U.S. at 552-56; <u>In re Hanford</u>, 534 F.3d at 1008-1009;

6    <u>Tosti</u>, 754 F.2d at 1488.

        C.    **Kaiser's Complaint Alleged a <u>Walker Process</u> Claim, as the Ninth**

7

8                    **Circuit Recognized When It Remanded that Claim for Trial.**

9               1.    **<u>Walker Process</u> Fraud Is Inherent to the Section 2 "Sham"**

10                     **Litigation Claims in Kaiser's March 22, 2002 Complaint.**

11

12       Abbott's contention that Kaiser never alleged <u>Walker Process</u> fraud in a

13   pleading should be disregarded.  <u>Walker Process</u> fraud was inherent to Kaiser's claim

14   that Abbott violated Section 2 of the Sherman Act by enforcing its '207 Patent in

15   frivolous, "sham" infringement actions against manufacturers of generic terazosin.

16   (SF ¶ 155.)  That is, of course, why Abbott's enforcement of the '207 Patent was

17   frivolous: Abbott was enforcing a patent it knew was invalid because it was

18   fraudulently prosecuted and obtained.  That <u>Walker Process</u> fraud is inherent in the

19   "sham" litigation claims related to the '207 Patent is obvious, is proven by the fact

20   that Abbott raises this nonsensical, purely-legal argument for the first time now, more

21   than seven years after Kaiser filed suit.  (SF ¶¶ 158-160.)

22              2.    **Abbott Has Waived Any Argument Concerning the Purported**

23                     **Effect of the "Bill of Particulars" on the Timeliness of Kaiser's**

24                     **<u>Walker Process</u> Claim.**

25       Following an October 8, 2003 status conference, the MDL Court ordered Kaiser

26   to provide additional details about its claims in the form of a "Bill of Particulars,"

27   which Abbott was required to "comment on."  (SF ¶ 156.)  Abbott filed its "comment"

28

on November 3, 2008, in which it proffered a lengthier case management schedule than the one offered by plaintiffs, argued against separate trials for individual plaintiffs and class plaintiffs, and commented on what it viewed to be an increase in the scope of the plaintiffs' *Section 1* claims concerning Abbott's agreements with manufacturers of generic terazosin. (SF ¶ 158.) Nowhere in the comment does Abbott articulate an objection to the timeliness of the details produced in Kaiser's "Bill of Particulars," let alone the argument it has contrived now. (SF ¶ 158.)

Similarly, on April 21, 2004, Abbott filed a motion for summary judgment with respect to Kaiser's "sham" litigation and <u>Walker Process</u> Section 2 claims. In its motion, Abbott did not articulate any argument that the critical date for the statute of limitations ran from the "Bill of Particulars." (SF ¶ 159.) In fact, Abbott did not mention the "Bill of Particulars" and contended that the "critical date" for purposes of the statute of limitations for Kaiser's Section 2 claims was "3/22/98" (*i.e.*, exactly four years before the filing of Kaiser's Complaint). (SF ¶¶ 159-160.)

Just as it had argued in its summary judgment briefing, Abbott contended on appeal to the United States Court of Appeals for the Ninth Circuit that Kaiser's Section 2 claims were barred by the statute of limitations. (SF ¶ 159.) Specifically, Abbott argued that Kaiser's Section 2 claims accrued before March 22, 1998 and that the continuing violation doctrine did not apply to claims based on enforcement of patents (whether prosecuted fraudulently or honestly) through infringement suits. Instead, Abbott argued, the claims accrued when Abbott filed its patent infringement actions. As before, Abbott did not mention the "Bill of Particulars" and did not articulate any argument that the statute of limitations ran from the "Bill of Particulars." (SF ¶¶ 158-159.)

Having chosen to omit this red-herring argument in its "comment" on the "Bill of Particulars," in its summary judgment briefing, and in its appellate briefing, Abbott

MEMORANDUM OF POINTS AND AUTHORITIES

has waived the argument.[11]  (SF ¶¶ 158-159.)  Abbott's failure to raise this argument previously also reveals the frivolity of the argument.

> 3.     **The "Bill of Particulars" Was Not an Amended Pleading, and Must Be Read in Conjunction with Kaiser's Complaint.**

In its brief, Abbott characterizes the "Bill of Particulars" as an amended pleading to support its argument that the statute of limitations runs from the "Bill of Particulars" and not from the date of Kaiser's Complaint.  Not surprisingly, Abbott cites no authority for its assertion that the "Bill of Particulars" can be treated the same as an amended complaint.  Indeed, the "Bill of Particulars" was not (and was not intended by the MDL Court to be) an amended complaint.  (SF ¶ 158.)  In its "comment" on the "Bills of Particulars," Abbott recognized that the "Bills of Particulars" produced by the plaintiffs were not amended pleadings: "Defendants renew the request in their October 8 Status Conference Statement that the Court order plaintiffs to file formal amended complaints."  (SF ¶ 158.)  The MDL Court would not have ordered the "produc[tion]" of a "Bill of Particulars," if had meant "the filing of an Amended Complaint."  (SF ¶ 156.)

By definition, the statute of limitation does not run from the "Bill of Particulars," for it is simply:

> [a] written statement or specification of the particulars of the demand for which an action at law is brought…furnished by one of the parties to the other, either voluntarily or in compliance with a judge's order for that purpose.  It is designed to aid the defendant in interposing the proper answer and in preparing for trial, by giving him detailed information regarding the cause of action stated in the complaint….the bill of particulars has been replaced by various discovery devices (Fed. R. Civil P. 26 et seq.) and by motion for more definite statement (Fed. R. Civil P. 12(e).

---

[11] In its argument concerning standing, Abbott acknowledges that its failure to raise certain offensive arguments in prior summary judgment briefing may constitute waiver.  (See Br. at 20 n.8.)

130047.00601/21814292v.2                          16

BLACK'S LAW DICTIONARY at p. 114 (6th ed. 1991). It is little different from a RICO Case Statement, which federal courts often order to be produced to provide defendants with additional details concerning a plaintiff's RICO claim. (SF ¶ 153.) Because a RICO Case Statement, not unlike the "Bill of Particulars" here, simply provides additional details pertaining to allegations contained in a pleading, courts consider the RICO Case Statement in conjunction with the complaint to which it relates (*i.e.*, as one pleading). See, e.g., Baxter v. A.R. Baron & Co., Inc., No. 94-3913, 1996 U.S. Dist. LEXIS 15098, at *12 n.6 (S.D.N.Y. Oct. 11, 1996). Plaintiffs' argument regarding the application of the relation-back doctrine to amended pleadings and newly asserted claims is, therefore, misplaced and irrelevant.[12]

> **4.    Kaiser Filed Suit within Four Years of the Last Date on Which It Was Forced to Pay a Supracompetitive Price for Hytrin.**

The statute of limitations for Kaiser's Section 2 claim is four years. See 15 U.S.C. § 15b. Abbott erroneously contends that the statute of limitations runs from the date Abbott filed its "sham" infringement actions against its competitors. However, Abbott ignores the fact that Kaiser is a direct purchaser of Hytrin from Abbott, not a manufacturer of terazosin competing with Abbott. The harm Kaiser suffered—having to pay a supracompetitive price for Hytrin—is entirely different from the harm Abbott's competitors would have suffered had they not been paid by Abbott to keep generic terazosin from coming to market.

Contrary to Abbott's suggestion, Kaiser has a Walker Process claim, notwithstanding the fact that Abbott enforced its patents only against its competitors

---

[12] Even assuming that the "Bill of Particulars" is the equivalent of an amended pleading, which Abbott has conceded it is not, (SF ¶ 158), it certainly relates back to the allegations in Kaiser's Complaint concerning the "sham" enforcement of the invalid '207 Patent because Walker Process fraud inheres in those allegations. After all, that is why the litigation was frivolous. The fact that the Ninth Circuit did not remand the claims based on "sham" litigation does not strip the detail and notice provided by those allegations in Kaiser's Complaint.

1   and not against direct purchasers such as Kaiser.  This fact is significant because of its

2   effect on the statute of limitations applicable to Kaiser's claim and the applicability of

3   the continuing violation theory.  The continuing violation doctrine applies to claims

4   brought by direct purchasers, and the distinction between competitors and direct

5   purchasers is, therefore, significant and ultimately fatal to Abbott's argument:

> Although the business of a monopolist's rival may be injured at
> the time the anticompetitive conduct occurs, a purchaser, by
> contrast, is not harmed until the monopolist actually exercises
> its illicit power to extract an excessive price….So long as a
> monopolist continues to use the power it has gained illicitly to
> overcharge its customers, it has no claim on the repose that a
> statute of limitations is intended to provide.  Thus, in this
> setting…each time a plaintiff is injured by an act of the
> defendants a cause of action accrues to him to recover the
> damages caused by that act….As to those damages, the statute
> of limitations runs from the commission of the act.

12

13  Eastman Kodak, 603 F.2d at 298 (quoting Zenith Radio Corp. v. Hazeltine Research,

14  Inc., 401 U.S. 321, 338 (1971)) (internal quotations omitted).

15      Abbott cites the Ninth Circuit's decision in Pace Indus., Inc. v. Three Phoenix

16  Co., 813 F.2d 234, 240 (9th Cir. 1987), for the proposition that commencement of

17  litigation is the date from which Kaiser's statute of limitations runs.  (Br. at 17.)  Pace,

18  however, concerned contract litigation and did not concern a Walker Process claim or

19  even a claim brought by a direct purchaser and is, therefore, irrelevant.  The Ninth

20  Circuit simply rejected the argument that the continuing violation theory applies to

21  each of a competitor defendant's acts in prosecuting a litigation.

22      Abbott also cites additional case law in support of its argument, but in none of

23  those cases did the court consider a situation such as this one, in which a direct

24  purchaser is forced to pay supracompetitive prices for years as a result of a

25  fraudulently-obtained patent.  Most of the other cases Abbott cites concern

26  competitors sued for patent infringement, not direct purchasers.  (Br. at 17-19 (citing

27  Al George, Inc. v. Envirotech Corp., 939 F.2d 1271 (5th Cir. 1991); Korody-Colyer

28  130047.00601/21814292v.2                    18

1  Corp. v. Gen. Motors Corp., 828 F.2d 1572 (Fed. Cir. 1987); David Orgell, Inc. v.

2  Geary's Stores, Inc., 640 F.2d 936 (9th Cir. 1981); In re Multidistrict Vehicle Air

3  Pollution, 591 F.2d 68 (9th Cir. 1979)).)   Significantly, Vehicle Air Pollution and

4  David Orgell were suits brought by competitors alleging a conspiracy to exclude them

5  from a particular market (emissions control systems and fine china, respectively), in

6  which the competitors could not establish any additional acts at all other than the

7  defendants' one-time *refusals* to deal. 591 F.2d at 69, 71.  Obviously, no continuing

8  acts occur following a refusal to deal.  Here, on the other hand, Abbott—enabled by

9  the '207 Patent—continued to deal with, and charge supracompetitive prices to,

10  Kaiser until Geneva came to market in August of 1999.  Case law involving only

11  refusals to deal is, therefore, wholly irrelevant.  Abbott also relies on the Supreme

12  Court's recent decision in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618

13  (2007), an employment discrimination suit having nothing to do with antitrust

14  violations, let alone the statute of limitations applicable to Section 2 antitrust claims.

15  (Br. at 18-19.)  Omitted from Abbott's citation, however, is the fact that, "[o]n

16  January 29, 2009, President Obama signed into law the 'Lilly Ledbetter Fair Pay Act

17  of 2009'…overturn[ing] the Supreme Court's 2007 holding in *Ledbetter*."  Aspilaire

18  v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 303 (S.D.N.Y. 2009); see also Harris v.

19  City of Fresno, 625 F. Supp. 2d 983, (E.D. Cal. 2009) (same).  Thus, the current law is

20  that a cause of action for employment discrimination, in that context, occurs each time

21  an employer pays an employee.  See id.

22      In fact, Abbott ignores the only law that is on-point.  In Molecular Diagnostics

23  Labs. v. Hoffmann-La Roche Inc., 402 F. Supp. 2d 276, 285-87 (D.D.C. 2005), the

24  United States District Court for the District of Columbia considered the precise

25  situation at issue here: a direct purchaser plaintiff sued a manufacturer of an enzyme

26  that had (1) obtained the patent for the enzyme by fraud on the PTO, and (2) enforced

27  that fraudulently-obtained patent in order to, along with a variety of other schemes and

28  130047.00601/21814292v.2                          19

1  agreements, monopolize the market and maintain a supracompetitive price for the

2  enzyme.  Id. at 278-279.  In Molecular Diagnostic, the court distinguished Pace and

3  other cases involving competitor plaintiffs from a case involving a direct purchaser

4  plaintiff, and held that the direct purchaser plaintiff had four years from the date of

5  each purchase of the product at the supracompetitive price to bring its claim:

> The instant case, however, does not involve a plaintiff
> competitor, nor is the enforcement of a patent the relevant
> injury….[the plaintiff] does not allege that [the defendants]
> sought to enforce the '818 patent against [the plaintiff].
> Instead, it asserts that its injury arose through the payment of
> supracompetitive prices resulting from an illegitimately
> obtained monopoly on [the chemical compound].
>
> That [the plaintiff] is litigating this action as a purchaser, not a
> competitor, is a critical distinction.
>
> *     *     *
>
> …the continuing violation theory entitles [the plaintiff] to
> pursue all claims accruing four years prior to the filing of its
> complaint.  Because [the plaintiff] is a purchaser, not a
> competitor, each time [the plaintiff] was allegedly forced to pay
> a supra-competitive price as a result of [the defendants']
> anticompetitive conduct, a separate injury accrued.

16  Id. at 286 (citing Eastman Kodak, 603 F.2d at 295; Klehr v. A.O. Smith Corp., 521

17  U.S. 179, 189 (1997) ("Antitrust law provides that, in the case of a continuing

18  violation, say a price fixing conspiracy that brings about a series of unlawfully

19  highpriced sales over a period of years, each overt act that is part of the violation and

20  injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running

21  again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier

22  times.")).

23      Finally, it is not inconsistent for Kaiser to rely on Abbott's anticompetitive

24  conduct during a period of time outside the four-year statute of limitations to prove its

25  Section 2 claim, while, at the same time, arguing that its claim did not accrue until a

26  later date, because "a purchaser suing a monopolist for overcharges paid within the

27  previous four years may satisfy the conduct prerequisite to recovery by pointing to

28  130047.00601/21814292v.2                    20

1  anticompetitive actions taken before the limitations period." <u>Eastman Kodak</u>, 603

2  F.2d at 296.

3  · Here, Kaiser was a direct purchaser of Hytrin, paying Abbott's

4  supracompetitive prices until Geneva entered the market with generic terazosin in

5  August of 1999. Therefore, the continuing violation theory applies to Kaiser's claims

6  such that the four-year statute of limitations runs from each date that Kaiser paid a

7  supracompetitive price for Hytrin.[13] Therefore Kaiser's claims are timely—whether

8  subject to class action tolling or calculated from Kaiser's Complaint.

9  **III.  ABBOTT'S MARKET-DEFINITION AND MARKET-SHARE ANALYSIS REQUIRES**

10  **THE JURY'S RESOLUTION OF DISPUTED ISSUES OF FACT AND IS IRRELEVANT**

11  **BECAUSE THERE IS UNDISPUTED DIRECT EVIDENCE THAT ABBOTT CHARGED**

12  **SUPRACOMPETITIVE PRICES FOR HYTRIN AND SUPPRESSED GENERIC**

13  **TERAZOSIN FROM ENTERING THE MARKET.**

14  Finally, Abbott moves for summary judgment, alleging that Kaiser cannot

15  prove Abbott possessed monopoly power in a relevant market. According to Abbott,

16  in order to determine whether it possessed monopoly power, the Court must conclude

17  that Abbott possessed enough market share in the "relevant market." However, this

18  type of detailed, fact-intensive inquiry is neither required under the law nor proper in

19  the context of summary judgment.

20  Abbott's position is a stunning reversal from its arguments in opposition to

21  summary judgment five years ago in the MDL. There, Abbott argued that its

22  monopoly power was not an appropriate issue for summary judgment because it

23  would usurp the role of the jury. (SF ¶ 162 ("There is no basis for this Court to weigh

24  the conflicting evidence on summary judgment. This is a jury issue and summary

25

26  _____

[13] The continuing violation theory would also apply and run from the date of Abbott's

27  illicit April 1, 1998 agreement with Geneva, pursuant to which Abbott paid Geneva
   several million dollars per month to stay out of the market, further establishing the
   timeliness of Kaiser's claims.

28  130047.00601/21814292v.2                    21

1   judgment must be denied.").)[14]  Now, five years later, based on the same set of facts

2   and essentially the same legal argument, Abbott does an about face.[15]  (SF ¶¶ 161-62.)

3   ***Abbott's motion should be denied on this basis alone***.

4          Setting aside that Abbott's market-definition argument is, by its own admission,

5   "essentially a fact question," (SF ¶ 162), its argument nonetheless fails for four

6   different reasons.

7          First, legally, Abbott's proposed methodology is both unnecessary and

8   inappropriate because there is undisputed direct evidence of the anticompetitive

9   effects of its conduct: supracompetitive prices for Hytrin and the suppression of

10  generic competition.  For the reasons set forth in the Memorandum of Points and

11  Authorities in support of Kaiser's Motion for Partial Summary Judgment, this direct

12  evidence obviates the need to conduct a market-definition analysis and establishes

13  Abbott's monopoly power as a matter of law.  (See Motion for Partial Summary

14  Judgment at 11-19.)

15         Second, Hytrin had no price competition—and no economic substitute

16  existed—prior to generic terazosin coming to market in August of 1999, and, thus, the

17  relevant market is at the molecule level.  Abbott's focus on therapeutic alternatives in

18  the alpha blocker class of drugs is misplaced because the existence of therapeutic

19  alternatives for Hytrin did not create price competition.  Therapeutic alternatives are

20  not economic substitutes.  (SF ¶ 164.)

21         Third, Abbott's purported R&D, marketing, and development costs do not

22  account for or justify either Abbott's supracompetitive price for Hytrin before generic

23

24

25  _____

    [14] (SMF ¶ 162 (citing U.S. Anchor Mfg., Inc. v. Rule Industries, Inc., 7 F.3d 986, 994
26  (11th Cir. 1993); Tunis Bros. Co.,, Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir.
    1991).)

27  [15] Abbott did not even move for summary judgment on this ground previously; rather,
    it defended against summary judgment by arguing that factual disputes existed.
28  130047.00601/21814292v.2                         22

1   terazosin came to market or Abbott's *immediate* inability to charge those

2   supracompetitive prices after generic terazosin entered the market.

3        Fourth, Abbott's reduction in the price of Hytrin after generic terazosin entered

4   the market had nothing to do with Kaiser's "negotiating muscle."

5        Abbott's monopoly power argument is little more than an effort aimed at

6   diverting attention from the simple facts of this case.  Abbott successfully blocked

7   generic competition by defrauding the PTO to obtain the '207 Patent, which it then

8   used to suppress generic competition and maintain supracompetitive prices for Hytrin.

9   **A.    Direct Evidence of Abbott's Monopoly Power Obviates the Need to**

10        **Pursue an Indirect Analysis and Establishes Abbott's Monopoly**

11        **Power as a Matter of Law.**

12        In this case, there is abundant direct proof of Abbott's monopoly power and its

13  anticompetitive effects.  As set forth in the Memorandum of Points and Authorities in

14  support of Kaiser's Motion for Partial Summary Judgment, this undisputed direct

15  evidence establishes Abbott's monopoly power as a matter of law.  Monopoly power

16  can be proven by either direct or circumstantial evidence.  Image Technical Services,

17  Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 1997) (citing Rebel Oil Co.

18  v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995)); see also In re Abbott

19  Labs. Norvir Anti-trust Litig., 552 F. Supp. 2d 1080, 1085-86 (N.D. Cal. 2008), rev'd

20  on other grounds, 571 F.3d 930 (9th Cir. 2009) (discussing direct evidence of the

21  defendant's price increase, the defendant's own internal predictions of the effect of the

22  drug's price, and the actual effect of the price increase).

23        Although antitrust plaintiffs often try to prove monopoly power through indirect

24  or circumstantial evidence, courts have long recognized that the best evidence of

25  monopoly power is direct evidence of the defendant's actual control over prices or its

26  actual exclusion of competition.  See Am. Tobacco Co. v. United States, 328 U.S.

27  781, 810-11 (1946); Conwood Co. L.P. v. U.S. Tobacco Co., 290 F.3d 768, 783 n.2

28  130047.00601/21814292v.2                          23

1  (6th Cir. 2002); <u>Byars v. Bluff City News Co.</u>, 609 F.2d 843, 850 (6th Cir. 1979).

2  Proving monopoly power through indirect or circumstantial evidence, on the other

3  hand, requires a complex, fact-intensive analysis. <u>Image Technical</u>, 125 F.3d at 1202-

4  1203 (quoting <u>Rebel Oil</u>, 51 F.3d at 1434). This complex, fact-intensive analysis is

5  simply not required when a party establishes monopoly power with direct evidence, as

6  Kaiser does here. <u>FTC v. Indiana Fed'n of Dentists</u>, 476 U.S. 447, 460-61 (1986)

7  (citations omitted); <u>see also</u> <u>Broadcom Corp. v. Qualcomm Inc.</u>, 501 F.3d 297, 307

8  n.3 (3d Cir. 2007) ("Because market share and barriers to entry are merely surrogates

9  for determining the existence of monopoly power, direct proof of monopoly power

10  does not require a definition of the relevant market."); <u>Toys "R" Us, Inc. v. FTC</u>, 221

11  F.3d 928, 937 (7th Cir. 2000) (same); <u>Re/Max Int'l, Inc. v. Realty One, Inc.</u>, 173 F.3d

12  995, 1018 (6th Cir. 1999) (same).

13      Here, undisputed direct evidence establishes that Abbott maintained prices of

14  Hytrin at a supracompetitive level and excluded competition prior to generic terazosin

15  coming to market in August 1999, rendering it superfluous to define a theoretical

16  relevant market and to calculate Abbott's share in that market. The direct evidence

17  includes:

18      1.    Abbott's internal admission that it controlled the market for terazosin

19          when, in 1997, it internally projected that if and when generic terazosin

20          entered the market, Abbott would lose 40% of its Hytrin sales within two

21          months and 80% of its Hytrin sales within a year, amounting to over $22

22          million per month in lost profits, (AUF ¶¶ 3, 5-6, 28-30, 53);

23      2.    Abbott's acknowledgement that its monopoly power would be destroyed

24          and its monopoly profits threatened were generic terazosin to come to

25          market, when it agreed to pay Geneva Pharmaceuticals $4.5 million per

26          month not to come to market with generic terazosin, (AUF ¶¶ 4, 20, 23);

27          and

28  130047.00601/21814292v.2         24

3.      The dramatic impact of the entry of generic terazosin and competition
when, (a) just after generic terazosin came to market in August of 1999,
Abbott offered to sell Hytrin to Kaiser for just $0.10 per tablet rather than
the $0.70 per tablet Abbott had been charging Kaiser—an 85% reduction
in price; and (b) one year after generic terazosin entered the market,
Abbott's Hytrin sales plummeted over 75%—just as Abbott had
predicted would happen, (AUF ¶¶ 32-38, 54).

Rarely does a court have a real-world experiment like this one, which proves
that Abbott had monopoly power.  Because of the existence of this undisputed direct
evidence, an indirect analysis is superfluous—there is no need to establish
circumstantially what we know directly.  Abbott possessed monopoly power.

**B.      Hytrin Had No Economic Substitute Prior to Generic Terazosin, and
the Relevant Market is at the Molecule Level**

Abbott contends that various alpha blockers, including Hytrin, are reasonably
interchangeable for the same purposes and thus must be included in the market.
Abbott attempts to define the relevant market as all alpha-blocker drugs, and then
suggests that it could not be a monopolist because its market share of that market was
under 50%.  That contention is both wrong and beside the point.  Abbott's contention
is wrong because the other alpha blockers were not sufficiently substitutable to define
the relevant market more broadly than the terazosin molecule itself.[16]  (SF ¶ 164.)

The 1992 DOJ/FTC Merger Guidelines define "relevant market" as the smallest
group of products for which a 5% increase in price would not cause enough buyers to
shift to other products so the increase would be unprofitable for the hypothetical
monopolist.  1992 Merger Guidelines § 1.11; see also United States v. Visa USA, Inc.,
163 F. Supp. 2d 302,336 (S.D.N.Y. 2001) (applying Merger Guidelines in a market

---

[16] In fact, the MDL Court already acknowledged that it was "persuaded that Abbott
has power in the relevant market, which is the market for Hytrin and its generic
bioequivalent forms of terazosin hydrochloride."  (AUF ¶ 45.)

130047.00601/21814292v.2                              25

1    definition analysis). The pricing history of brand-name Hytrin, and the purchasers'

2    responses in each case, make it clear that Abbott could and did profitably increase

3    Hytrin prices without suffering the "critical loss" necessary under the Guidelines to

4    expand the scope of the relevant market.  Even if there were a serious dispute about

5    that, the argument is misguided because of the direct evidence of Abbott's ability to

6    maintain prices above competitive levels, and certainly above marginal cost.

7        Moreover, Abbott's view of defining the relevant market at the alpha blocker

8    level would essentially ignore the inherent monopoly power of its '207 Patent.  It

9    cannot be disputed that the '207 Patent provided the Abbott with monopoly power to

10   block generic competition.  If the Hytrin patent was important, then it stands to reason

11   that Abbott could control the prices of Hytrin by foreclosing entry into the market by a

12   generic competitor, which establishes that the terazosin molecule is the relevant

13   antitrust market.

14       Likewise here, the exclusionary conduct—Abbott's use of its patent to maintain

15   Hytrin prices at a supracompetitive level to prevent generic competition—was focused

16   on the terazosin hydrochloride market, not the alpha blocker market.  Thus, any

17   discussion of relevant market must be confined to the molecule level, which is the

18   brand and its generic equivalents, and not the broader alpha blocker market that

19   Abbott proposes.[17]

20       Abbott suggests that therapeutic interchangeability is equivalent to economic

21   interchangeability.  It is not.  In the pharmaceutical industry, therapeutic alternatives

22   are not economic substitutes.  (SF ¶ 164.)  Unless the alpha blockers are economic

23   substitutes for Hytrin, their existence is legally irrelevant to the existence of monopoly

24   power—"the power to raise prices to supra-competitive levels."  U.S. Anchor Mfg.,

---

25   [17] Thus, the focus is not on the **mere existence** of the '207 patent.  Rather, the focus is

26   on how Abbott *used* that patent to maintain supracompetitive prices and exclude
     generic competition.  Abbott's cite, then, to Illinois Tool Works Inc. v. Independent

27   Ink, Inc., 547 U.S. 28, 44-45 (2006), for the proposition that a patent does not
     necessarily confer monopoly power is inapposite.

28   130047.00601/21814292v.2                    26

1    Inc. v. Rule Indus., Inc., 7 F.3d 986, 994 (11th Cir. 1993).  When considering

2    monopoly power, the only alternatives that matter are those that prevent the alleged

3    monopolist from raising prices to supracompetitive levels—*i.e.*, those that are

4    economic substitutes.  See Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc., 275

5    F.3d 762, 767 (9th Cir. 2001) ("The outer boundaries of a product market are

6    determined by the reasonable interchangeability of use or the cross-elasticity of

7    demand between the product itself and substitutes for it….Where an increase in the

8    price of one product leads to an increase in demand for another, both products should

9    be included in the relevant product market.") (citations omitted).

10          Unlike commodity markets, the healthcare and pharmaceutical industries are

11    not as susceptible to switching.  Dr. Mark Soloway, Abbott's physician expert relied

12    on here, stated in his deposition that physicians do not write prescriptions on the basis

13    of price. (SF ¶ 164.)  So, according to Abbott's own expert, even if Hytrin were

14    therapeutically interchangeable, physicians would not turn to other treatments based

15    upon the price of the treatment, meaning that brand-name drugs such as Hytrin are not

16    economic substitutes even if they are therapeutic substitutes with other alpha blockers.

17    (SF ¶ 164.)  It is undisputed that other alpha blockers did not force Abbott to reduce

18    its price for Hytrin, and it is equally undisputed that the entry of generic terazosin did.

19          Simply put, the fact that therapeutic alternatives (*i.e.*, other brand-name drugs)

20    exist does not prevent the manufacturer of another brand-name drug such as Hytrin

21    from raising prices above competitive levels.[18]  In this case, there was no price

22    competition—and no economic substitute—for Hytrin before August of 1999,

23    because, as Abbott's Director of Pricing and Contracting Joseph E. Fiske

24

25    _____

26    [18] This, of course, does not occur unchecked.  Eventually the existence of alternative
treatments will reign in monopolist pricing.  Put another way, a monopolist will raise
27    its prices to the point that the market can sustain.  See United States v. Aluminum Co.
of America, 148 F.2d 416, 426 (2d Cir. 1945) ("substitutes are available for almost all
commodities, and to raise the price enough is to evoke them.").

28    130047.00601/21814292v.2                     27

1  acknowledged during his deposition, it was not until then—after the alleged

2  therapeutic alternatives were on the market—that Abbott lowered its prices for Hytrin:

3        A.    After [Hytrin] went generic we approached a number of
            different closed businesses…that had large utilization of
4        HYTRIN and we offered to meet the competition's price if they
            would continue to stock HYTRIN.
5
        Q.    When you say meet the competition you're referring to
6        the price of the generic product?

7        A.    Yes.

8  (SF ¶ 165.)

9        What constrains a "defendant's ability to raise prices…is 'the elasticity of

10  demand faced by the defendant—the degree to which its sales fall…as its prices rise.'"

11  Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 469 n.15 (1992).  In the

12  pharmaceutical industry that elasticity of demand is such that a brand-name

13  manufacturer without generic drug competition faces a very low elasticity of demand.

14  Its sales do not fall as the price of its product rises.  Again, this is because drug-

15  switching generally occurs as a result of issues related to therapy, and not price.  See,

16  e.g., SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063-64 (3d Cir. 1978)

17  (holding that although two drug molecules were in the same therapeutic class, there

18  was not sufficient cross-price elasticity to justify classifying the drugs as economically

19  interchangeable).  Thus, the presence of numerous, so-called therapeutic equivalents

20  does not alter the economic landscape; physicians will prescribe the drug they feel

21  best suits the need of their patient unless and until there arises a therapeutic need to

22  switch.  (SF ¶ 164.)  And so, as the evidence here establishes, it is the existence of a

23  generic version of a brand-name drug, and not the existence of several brand-name

24  drugs in a therapeutic class, that impacts price.  (SF ¶ 164; AUF ¶¶ 32-38, 54.)

25

26

27

28

1   **C.    Abbott's Alleged R&D Costs Did Not Affect the Price for Hytrin and**
2          **Are, in Any Event, Irrelevant**

3   Abbott's attempt to justify its supracompetitive price for Hytrin by reference to

4   its alleged R&D investment in the drug is nonsensical and irrelevant. Abbott seems to

5   forget that such investment is precisely the reason why they were awarded the patent.

6   These arguments do nothing to explain away the anticompetitive effects arising from

7   Abbott's inappropriate maintenance of its monopoly power.[19]

8   Essentially, Abbott argues that notions of monopoly power ought to apply

9   differently in an industry like the pharmaceutical industry, in which (Abbott contends)

10  there are considerable and unique up-front fixed costs, such as R&D. Abbott's R&D

11  expenses are fixed costs. More precisely, Abbott's R&D expenses are sunk costs,

12  which, as a matter of basic economics, are investment costs that are incurred before a

13  certain activity takes place and that are, by definition, never recoverable. P.

14  Samuelson, et al. MICROECONOMICS 167 (1998). Abbott's R&D expenses are

15  irrelevant to Abbott's profit-maximizing price. The price which will maximize

16  Abbott's profits on Hytrin depends solely on (1) the elasticity of demand for Hytrin at

17  that time and (2) the marginal cost of producing and marketing Hytrin at that time.

18  Neither past nor current R&D expenses enter into the calculation.

19  Moreover, one of the main reasons that Abbott, and similarly-situated firms

20  (those in the film industry, for example), are granted patents (or copyrights) is to

21  permit them temporarily to exclude competitors and charge supracompetitive prices in

22  order to be able to recover fixed and up-front costs, which, of course, encourages

23  ----

24  [19] Abbott misses the point when it argues that all brand-name products run the risk of
    being wrongfully branded with the "monopolist" label if there exists a brand
25  name/generic pricing difference, suggesting that a finding that Abbott possessed
    monopoly power criminalizes pharmaceutical patents and renders patents valueless. It
26  is important to keep in mind that Abbott enjoyed years of legitimate exclusivity in the
    terazosin market, making its patents valuable indeed. Whether Abbott unlawfully
27  maintained (or extended) its monopoly by fraudulently obtaining another patent to
    suppress generic competition is not yet at issue; that issue—the second element of
28  Kaiser's Section 2 claim—will be resolved by the jury at trial on additional evidence.

1    innovation.  Congress recognized this limited, legitimate reward in the Hatch-

2    Waxman Act, for which the 1994 Amendments "embody Congress' intent 'to make

3    available more low cost generic drugs' and its attempt 'to balance two conflicting

4    policy objectives: to induce name-brand pharmaceutical firms to make the investments

5    necessary to research and develop new drug products, while simultaneously enabling

6    competitors to bring cheaper, generic copies of those drugs to market.'"  In re

7    Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 628 (2000) (internal quotes and

8    citations omitted).  Thus, Abbott's R&D costs, which were already recouped by

9    Abbott through its initial, legitimate patent exclusivity, do not account for the pricing

10   difference between Hytrin and generic terazosin.[20]

11        Moreover, the facts reveal that Abbott's argument that the price for Hytrin was

12   tied to R&D costs is nonsense.  Abbott charged Kaiser $0.70 per tablet until generic

13   terazosin came to market, at which point Abbott immediately lowered its price by

14   80%.  (AUF ¶¶ 32-38, 54.)  The reduction in price was attributable solely to the entry

15   of generic terazosin and had nothing to do with Abbott's having miraculously

16   recouped its R&D costs.  (AUF ¶¶ 3, 5-6, 28-30, 32-38, 53-54.)  More importantly,

17   the price Abbott charged did not depend on the amount of its R&D costs.  If Abbott

18   had $1 of R&D costs or $100 billion of R&D costs it still would have charged $0.70

19   per tablet until generic terazosin came to market.[21]

---

[20]  Additionally, Abbott is moving for summary judgment on the basis that its costs at
all times determined the price it charged for Hytrin and, therefore, bears the burden of
proof.  Abbott fails to meet that burden, as it has set forth no facts—let alone
undisputed facts—concerning costs.  As with other deficiencies, Abbott may not
present evidence of costs in a reply brief.

[21]  Additional counter-factual hypotheticals are helpful.  Suppose Abbot found out long
after the generic had been on the market that Abbott had neglected to pay a particular
R&D cost that it thought had been paid.  Would Abbott have then raised the price for
Hytrin?  No.  Conversely, if Abbott learned that it was receiving a rebate from a
payment it had made for R&D costs, would Abbott have reduced the price for Hytrin?
No.  Finally, if a generic had never come to market, would Abbott have materially
changed the price for Hytrin?  No.  Costs have nothing to do with Abbott's pricing of
Hytrin.

28

1   **D.   Abbott's Offer to Reduce the Price of Hytrin Occurred because**

2         **Introduction of the Generic Eliminated Abbott's Ability to Price**

3         **Hytrin at Supracompetitive Levels.**

4         Finally, Abbott argues that its $0.10 offer to Kaiser for Hytrin tablets in August

5   of 1999, after generic entry, is irrelevant.  Here, Abbott alleges that it was Kaiser's

6   significant "negotiating muscle" that brought about that sudden, precipitous offer to

7   drop the price of Hytrin.  If this were so, could Kaiser not have used that same

8   negotiation strength to secure a price lower than the approximately $0.70 per tablet

9   that Abbott was charging Kaiser prior to generic entry?  Would Abbott have this Court

10  believe that Kaiser's negotiating strength was at its apex only after the generic came in

11  the market?  The fact that Abbott was able to make such an offer establishes that

12  Abbott priced Hytrin supracompetitively prior to generic entry.[22]  And it was the

13  introduction of the generic into the market, not Kaiser, that caused Abbott to reduce

14  the price for Hytrin.  (AUF ¶¶ 3, 5-6, 28-30, 32-38, 53-54; SF ¶ 165.)

15        In sum, Abbott asks this Court to determine that it lacked monopoly power

16  through an elaborate market-definition analysis. However, legally, this indirect

17  monopoly power analysis is unnecessary because there is direct evidence of the

18  anticompetitive effects of Abbott's monopoly power—supracompetitive prices and

19  suppressed generic competition—that establishes Abbott's monopoly power as a

20  matter of law.  Furthermore, even if this analysis were appropriate, it is inextricably

21  intertwined with factual disputes, as Abbott conceded in the MDL in 2004, (SF ¶ 162).

22        Additionally, the market definition analysis Abbott presents is flawed.  It

23  completely ignores the fact that Hytrin had no price competition—and no economic

24  substitute—until generic terazosin came to market in August of 1999.  Although

25  Abbott contends that Hytrin is one of many alpha blockers, the price Abbott charged

26

27  [22] Abbott extended a similar offer to Caremark, further evidencing the irrelevance of its argument.

28  130047.00601/21814292v.2                  31

1  for Hytrin was not tied to or affected by the prices charged by other brand-name alpha

2  blockers. (SF ¶ 164.)  Its own expert acknowledges that drugs are not prescribed

3  based upon price. (SF ¶ 164.)  Similarly, Abbott's contention that its prices and the

4  change in price in August of 1999 are attributable to Abbott's R&D costs for Hytrin or

5  to Kaiser's negotiating strength are irrelevant and untrue.  Abbott's change in price

6  was a result of generic terazosin coming to market and nothing else.  (AUF ¶¶ 3, 5-6,

7  28-30, 32-38, 53-54; SF ¶ 165.)

8       As such, the Court should deny Abbott's motion for summary judgment on

9  monopoly power.

## CONCLUSION

11       Each of Abbott's three arguments fails.  First, Kaiser has standing as a direct

12  purchaser of Hytrin to assert its Walker Process claim.  Second, Kaiser's Walker

13  Process claim is timely both (1) because it was tolled by the class action filed in

14  August of 2000 in the MDL and (2) under the continuing violation theory when

15  calculated from Kaiser's March 22, 2002 Complaint.  Third, Abbott's market-

16  definition and market-share analysis is unnecessary because, as set forth in Kaiser's

17  Motion for Partial Summary Judgment, there is undisputed direct evidence that Abbott

18  charged supracompetitive prices for Hytrin and suppressed generic competitors from

19  coming to market with generic terazosin until August of 1999, which establishes

20  Abbott's monopoly power as a matter of law.  For these and the foregoing reasons,

21  this Court should deny Abbott's Motion for Summary Judgment on all grounds and

22  grant Kaiser's Motion for Partial Summary Judgment.

MEMORANDUM OF POINTS AND AUTHORITIES

1  Dated: September 11, 2009                    Respectfully submitted,

2                                                BLANK ROME LLP

3                                                By:    /s/  Ann B. Laupheimer
                                                 ANN B. LAUPHEIMER (*pro hac vice*)
4                                                JOSEPH M. PROFY (*pro hac vice*)
                                                 One Logan Square
5                                                130 North 18th Street
                                                 Philadelphia, Pennsylvania 19103-6998
6                                                Telephone: 215.569.5500
                                                 Facsimile:  215.569.5555
7                                                E-mail: laupheimer@blankrome.com
                                                         profy@blankrome.com
8
                                                 W. SCOTT SIMMER (*pro hac vice*)
9                                                HARDY VIEUX (*pro hac vice*)
                                                 600 New Hampshire Avenue, N.W.
10                                               Washington, D.C. 20037
                                                 Telephone: 202.772.5800
11                                               Facsimile:  202.772.5858
                                                 E-mail: simmer@blankrome.com
12                                                       vieux@blankrome.com
                                                 ***Attorneys for Kaiser Foundation***
13                                               ***Health Plan, Inc.***

14

15                                   **CERTIFICATE OF SERVICE**

16
              I HEREBY CERTIFY that on the 11th day of September, 2009, I electronically
17
    filed the foregoing Memorandum of Points and Authorities in support of Plaintiff's
18
    Motion for Partial Summary Judgment Motion on Monopoly Power with the Clerk of
19
    the Court using the CM/ECF system.
20

21
                                                 By:  *Linda Sepulvado*
22                                                    Linda Sepulvado

23

24

25

26

27

28  130047.00601/21814292v.2                        33
    ────────────────────────────────────────────────────────────
                    **MEMORANDUM OF POINTS AND AUTHORITIES**