1  BLANK ROME LLP
   ANN B. LAUPHEIMER (*Pro Hac Vice*)
2  laupheimer@blankrome.com
   JOSEPH M. PROFY (*Pro Hac Vice*)
3  profy@blankrome.com
   130 North 18th Street
4  Philadelphia, Pennsylvania 19103-6998
   Telephone:  215.569.5500
5  Facsimile:   215.569.5555

6  BLANK ROME LLP
   W. SCOTT SIMMER (*Pro Hac Vice*)
7  simmer@blankrome.com
   HARDY VIEUX (*Pro Hac Vice*)
8  vieux@blankrome.com
   600 New Hampshire Avenue, N.W.
9  Washington, D.C.  20037
   Telephone:  202.772.5800
10 Facsimile:   202.772.5858

11 Attorneys for Plaintiff
   KAISER FOUNDATION HEALTH PLAN, INC.
12

13            UNITED STATES DISTRICT COURT

14   CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

15

16 KAISER FOUNDATION HEALTH        CASE NO. CV 02-02443-JFW (FMOx)
   PLAN INC.,
17                                 **REPLY TO DEFENDANT ABBOTT
               Plaintiff,          LABORATORIES' OPPOSITION TO
18                                 KAISER'S MOTION FOR PARTIAL
        v.                         SUMMARY JUDGMENT ON
19                                 MONOPOLY POWER**
   ABBOTT LABORATORIES,
20                                 Hearing Date:        October 5, 2009
               Defendant.         Hearing Time:              1:30 PM
21                                 Room:            Courtroom #16
                                   Pre-trial Conference:   Jan. 8, 2010
22                                 Trial:               Jan. 26, 2010

23                                 JUDGE:    HON. JOHN F. WALTER
24

25

26

27

28

REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1

## INTRODUCTION

2   Kaiser[1] has moved for partial summary judgment on a narrow ground fully

3   contemplated and accepted by antitrust law. Kaiser has set forth conclusive and

4   undisputed direct evidence that Abbott charged a supracompetitive price for Hytrin

5   and suppressed generic terazosin from coming to market:

6       1. Abbott charged Kaiser approximately $0.70 per tablet for Hytrin before

7          generic terazosin came to market, (AUF ¶¶ 2, 31);

8       2. Abbott predicted (internally) that its sales for Hytrin would plummet nearly

9          80% once generic terazosin came to market (AUF ¶¶ 3, 5-6, 28-30, 53);

10      3. Abbott entered into agreements with manufacturers of generic terazosin to

11         prevent generic terazosin from coming to market, (AUF ¶¶ 4, 20, 23); and

12      4. once manufacturers were finally able to come to market with generic

13         terazosin, Abbott offered to sell Kaiser Hytrin for just $0.10 per tablet—an

14         *immediate*, 86% reduction in the price Abbott was willing to charge for

15         Hytrin—and, as predicted, its sales of Hytrin plummeted 75% within a year,

16         (AUF ¶¶ 32-38, 54).

17  It is undisputed that monopoly power may be established by direct evidence of

18  anticompetitive effects. Here, the undisputed evidence of the anticompetitive effects

19  of Abbott's conduct establishes Abbott's monopoly power as a matter of law. The

20  existence of this evidence renders superfluous any exercise Abbott advances to

21  "measure [its] ability to lessen or destroy competition," (Opp'n at 1). Abbott does not

22  contest the direct evidence Kaiser has set forth and, instead, attempts to distract the

23  Court with immaterial facts, none of which establishes a genuine dispute as to the

24  facts set forth in Kaiser's Motion. As such, and for the reasons set forth in Kaiser's

25  Motion, the Court should grant Kaiser's Motion and find that Abbott possessed

26  monopoly power before generic terazosin came to market.

27  [1] Abbreviations used here parallel those used in the memorandum in support of
Kaiser's Motion for Partial Summary Judgment ("Motion" or "Mot.") and in the
28  opposition filed by Kaiser in response to Abbott's Motion for Summary Judgment.

---

REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## ARGUMENT

**I.     THERE IS NO NEED TO DEFINE A "MARKET" TO ESTABLISH ABBOTT'S MONOPOLY POWER BECAUSE THERE IS UNDISPUTED DIRECT EVIDENCE OF THE ANTICOMPETITIVE EFFECTS OF ABBOTT'S CONDUCT.**

Unable to dispute the direct evidence of the anticompetitive effects of its conduct, Abbott contends that this Court must first engage in an analysis of circumstantial evidence to determine what Abbott contends is the "relevant market." Abbott cites no authority to support its position that proof of monopoly power based on direct evidence of the anticompetitive effects of its conduct also requires that Kaiser define a relevant market and Abbott's share in that market. Abbott's inability to do so is not at all surprising because, as set forth at length in Kaiser's Motion, monopoly power may be established in either of two different ways: (1) direct evidence of anticompetitive effects; or (2) indirect, circumstantial evidence used to define a theoretical market and a defendant's share in that market. See, e.g., Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995) ("Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power.").

Abbott complains that, "without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." (Opp'n at 8 (citing Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172 (1965); Fount-Whip, Inc. v. Reddi-Wip, Inc., 568 F.2d 1296 (9th Cir. 1978)).) While that may be true in other cases, the argument fails here because there is another and better "way"—one which does not require any subjective, speculative "measur[ing]"—to establish that Abbott actually has lessened or destroyed competition. The existence of undisputed direct evidence of Abbott's supracompetitive price for Hytrin and suppression of generic terazosin establishes not only Abbott's "ability" to lessen or destroy competition but also that Abbott actually did so. (See, e.g., AUF ¶¶ 2-6, 20,

1

**REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    23, 28-38, 54.)  It is ludicrous to suggest that this Court must engage in an inferential

2    analysis to prove what the undisputed direct evidence already establishes.

3        As a fallback, Abbott wrongly suggests that direct evidence may only be used

4    to establish "market power" for purposes of a Section 1 claim and not for purposes of

5    a Section 2 claim, criticizing what it calls "Kaiser's casual mixing of cases and

6    discussions concerning market power under Section 1 and monopoly power under

7    Section 2." (Opp'n at 12.)  But Abbott's attack runs headlong into the clear authority

8    for Kaiser's position found in the decision of the Ninth Circuit:

9            Monopoly power is the power to control prices or exclude
             competition.  As noted, § 2 monopoly claims require a
10           showing of monopoly power, commonly referred to as
             market power.  Market power can be proven by either direct
11           or circumstantial evidence.

12

13   Image Technical Services Inc. v. Eastman Kodak, 125 F.3d 1195, 1202 (9th Cir.

14   1997) (citations omitted).

15       Moreover, Abbott readily admits, as it must, that several courts—including, but

16   not limited to, Image Technical, 125 F.3d at 1202, Broadcom Corp. v. Qualcomm

17   Inc., 501 F.3d 297, 307 (3d Cir. 2007), and Re/Max Int'l, Inc. v. Realty One, Inc., 173

18   F.3d 995, 1018 (6th Cir. 1999)— have stated that, in the context of Section 2, direct

19   evidence may be used to establish monopoly power and some in which courts have

20   considered the sufficiency of the direct evidence.  (See Opp'n at 12-13.)  Abbott

21   dismisses those cases as the product of faulty logic, stating that the "suggestions" in

22   those cases "are contrary to actual holdings of the Supreme Court and the Ninth

23   Circuit."  Yet Abbott cites to no Supreme Court or Ninth Circuit case that holds that

24   "monopoly power could [not] be shown in a Section 2 case by so-called 'direct

25   evidence,' without proof of a relevant market." (Opp'n at 12.)  Indeed, there is no

26   such case.  Instead, Abbott bases its argument on nothing more than *ipse dixit*, stating

27   that "there are important economic reasons why proof of a relevant market—rather

28

                                             2

**REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    than so-called 'direct evidence'—must be shown in a Section 2 case," but it cites no

2    authority and offers none of the "economic reasons" it finds "important." (Opp'n at

3    13.)

4         The use of direct evidence does not depend on the classification of a claim

5    arising under Section 1 or 2 of the Sherman Act or Section 7 of the Clayton Act.  The

6    point, which is self evident, is that an antitrust plaintiff may establish monopoly power

7    with direct evidence in lieu of the indirect method, which analyzes circumstantial

8    evidence to <u>infer</u> monopoly power.  (<u>See</u> Mot. at 13-14.)  Thus, contrary to Abbott's

9    statement in its Opposition, direct evidence is the preferred method of proving

10   monopoly power; it is not a substitute for an indirect analysis of circumstantial

11   evidence.[2]  <u>See</u> <u>FTC v. Indianan Fed'n of Dentists</u>, 476 U.S. 447, 460-61 (1986)

12   (describing the indirect method of proof as "but a surrogate for detrimental effects").

13   Whether, as Abbott contends, there must be "greater" "market power" for purposes of

14   a Section 2 claim than for purposes of a Section 1 claim is irrelevant.[3]  Moreover,

15   Abbott concedes that "monopoly power" is established by "the ability to push prices

16   to what economists call the 'monopoly' level." (Opp'n at 10.)  That is, of course,

17   exactly what the direct evidence establishes here.  (<u>See, e.g.</u>, AUF ¶¶ 2-6, 20, 23, 28-

18   38, 54; SF ¶ 165.)

19

20

21

_____

22   [2] In its Opposition, Abbott erroneously characterizes the direct evidence method of
     proof as a "substitute for evidence of market share in a relevant market." (Opp'n at
23   14.)  While an antitrust plaintiff may establish a defendant's monopoly power with
     either direct or indirect evidence, the Supreme Court and circuit courts have made
24   clear that it is the indirect method that is the substitute. (<u>See</u> Mot. at 13-14 (collecting
     cases).)
25
     [3] That some courts have discussed the availability of direct evidence to establish
26   monopoly power for purposes of a Section 2 claim, yet nonetheless found the
     particular direct evidence lacking, likewise has no significance here.  The evidence
27   presented by Kaiser here, unlike the evidence found lacking in those cases, is
     unambiguous and conclusive direct evidence of the anticompetitive effects of the
28   defendant's conduct.

3

**REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1  **II.    ABBOTT'S PURPORTED "EVIDENCE THAT IT LACKED MONOPOLY POWER" IS
2     IMMATERIAL AND DOES NOT ESTABLISH A GENUINE ISSUE OF MATERIAL
      FACT AS TO ITS SUPRACOMPETITIVE PRICE FOR HYTRIN AND SUPPRESSION OF
3     GENERIC TERAZOSIN FROM COMING TO MARKET.**

4        The remainder of Abbott's argument reduces to a regurgitation of the argument

5  it advanced in its own motion for summary judgment, in which Abbott seeks summary

6  judgment under the *second* of the two approaches to establishing monopoly power—

7  the indirect evidence method.  Abbott characterizes the circumstantial evidence of

8  "market definition" and "market share" as "evidence that it lacked monopoly power,"

9  (Opp'n at 13), arguing that these and other "additional relevant facts...demonstrate a

10 genuine issue as to monopoly power," (Opp'n at 14).

11       However, there is no reason for the Court here to resort to analysis of

12 circumstantial evidence where there is no dispute of *material* fact as to the *direct*

13 evidence of the anticompetitive effects of Abbott's conduct.[4]  (Opp'n at 14-15.)

14 Abbott does not dispute that it (1) charged Kaiser approximately $0.70 per tablet for

15 Hytrin before generic terazosin came to market, (AUF ¶¶ 2, 31); (2) predicted

16 (internally) that its sales for Hytrin would plummet nearly 80% once generic terazosin

17 came to market, (AUF ¶¶ 3, 5-6, 28-30, 53); (3) successfully excluded manufacturers

18 of generic terazosin from the market by paying them several million dollars per month

19 not to come to market, (AUF ¶¶ 4, 20, 23); and (4) offered to sell Kaiser Hytrin for

20 just $0.10 per tablet *immediately* upon the availability of generic terazosin—an 86%

21 reduction in its price, (AUF ¶¶ 32-38, 54).  Rather, Abbott continues to theorize about

22 "market definition" and its "market share,"[5] when those issues, and the "evidence" it

23 ---
[4] Conversely, as set forth fully in Kaiser's opposition to Abbott's Motion for
24 Summary Judgment, there is at least a genuine dispute as to whether Abbott is entitled
   to summary judgment on the basis of *indirect* proof of monopoly power—*i.e.*, by an
   indirect market definition and market share analysis.
25
[5] This argument is nothing more than a restatement of Abbott's first argument that
26 Kaiser must prove a "relevant market," even if there is undisputed direct evidence of
   the anticompetitive effects of Abbott's conduct, and would require that this Court
27 unnecessarily engage in an analysis of circumstantial evidence of market definition
   and market share.
28

4

1  advances to support its position on those issues, have no bearing on a direct evidence

2  situation such as the one here.  Thus, the evidence Abbott offers concerning a

3  "therapeutic class of alpha-blockers" that purportedly "constituted more than 50

4  percent of the relevant market" is simply not material to the facts asserted in Kaiser's

5  Motion.[6]  (Opp'n at 13-14.)

6        In yet another effort to confuse the issues, Abbott concedes that there is a

7  distinction between direct evidence and indirect evidences, but asserts that "Abbott's

8  evidence is not just that it has a low market share in the relevant market.  Abbott also

9  has direct evidence that it lacks monopoly power." (Opp'n at 15.)  However, Abbott

10  does not actually present any evidence at all.  Instead, Abbott argues that a "direct

11  evidence" case requires direct evidence of reduced output. (Opp'n at 15.)  Abbott has

12  attempted to persuade the courts before that only certain types of direct evidence are

13  sufficient to prove monopoly power and failed.  See In re Abbott Labs. Norvir Anti-

14  Trust Litig., 562 F. Supp. 2d 1080, 1085 (N.D. Cal. 2008), rev'd on other grounds,

15  571 F.3d 930 (9th Cir. 2009).  (See also Mot. at 13.)  In Norvir, the plaintiff argued

16  that Abbott possessed monopoly power because there was direct evidence of Abbott's

17  price increase, Abbott's own internal predictions of the effect of the drug's price, and

18  the actual effect of the price increase.  Abbott contended that the plaintiff's evidence

19  was insufficient because it could only offer direct evidence of "restricted output and

20  consequent supracompetitive prices." Id. at 1085.  The Northern District of California

21  expressly rejected Abbott's argument, however, recognizing that supracompetitive

22  prices and restricted output are simply one of many types of direct evidence of

23  anticompetitive effects that are "sufficient" to establish monopoly power. Id.  The

24  court stressed that the form of the direct evidence is not significant, because "[t]he

25  _____

   [6] Indeed, in In Remeron Direct Purchaser Antitrust Litig., which Abbott relies on here,
26  the court deferred ruling on the defendant's motion for partial summary judgment
   premised on indirect evidence and considered only direct evidence in ruling on the
27  plaintiff's motion for partial summary judgment premised on direct evidence. 367 F.
   Supp. 2d 675, 676 n.1 (D.N.J. 2005).
28

REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   defining characteristic of direct evidence is that it demonstrates actual injury to

2   competition." Id. at 1085.  (See also Mot. at 12-14 (collecting cases).)  Abbott's

3   argument here is no different and should be rejected just as it was in Norvir.

4          A.    Abbott's Price for Hytrin before Generic Terazosin Came to Market
                  Was Supracompetitive.
5

6          Abbott argues that its price for Hytrin was not supracompetitive before generic

7   terazosin came to market for three reasons: (1) the price could have been even higher,

8   (Opp'n at 15); (2) Abbott set the price at that level to account for its alleged R&D and

9   promotional costs, (Opp'n at 6, 16-18); and (3) Abbott still charges a small number of

10  purchasers high prices for Hytrin and only offered Kaiser a competitive price of $0.10

11  per tablet because of its buying power,[7] (Opp'n at 6-7, 18).  The Court may safely

12  disregard these arguments as they are unsupported by record evidence and insufficient

13  to defeat summary judgment in any event.

14         First, Abbott curiously contends that the price it charged for Hytrin was not

15  supracompetitive enough to amount to monopoly power because it could have charged

16  even higher prices before generic terazosin came to market.  (Opp'n at 15 (discussing

17  how Abbott discounted its prices for certain purchasers).)[8]  The $0.70 per tablet

18  Abbott charged Kaiser was itself a supracompetitive price, as is evidenced by

19  Abbott's immediate willingness to reduce the price by 86% once generic terazosin

20  came to market (and only because generic terazosin came to market).  (AUF ¶¶ 6, 32-

21  38, 54.)  If Abbott's point is that an even higher supracompetitive price would have

22  caused Kaiser additional damages in overpayments, that is, of course, true.

23  _____

[7] Abbott focuses on Kaiser as though it were the only purchaser offered a price set to
24  match the price of generic terazosin.  It is not disputed, however, that the offer Abbott
    made to Kaiser was similar to other offers it extended to large-scale purchasers of
25  Hytrin that planned to switch to generic terazosin.  (See, e.g., SF ¶ 165.)

26  [8] Elsewhere in its Opposition, Abbott repeats its suggestion that certain levels of
    supracompetitive pricing are not evidence of monopoly power.  (See Opp'n at 14
27  ("undisputed facts that might constitute some direct evidence that Abbott engaged in
    any level of supra-competitive pricing of its product").)

28
                                          6

1   Otherwise, the distinction between supracompetitive prices and higher

2   supracompetitive prices is meaningless.

3         Second, Abbott contends that its supracompetitive price was justified by its

4   alleged R&D and promotional costs.  However, it is not disputed that Abbott charged

5   Kaiser $0.70 per tablet until generic terazosin came to market, at which point Abbott

6   *immediately* lowered its price by 86%.  (AUF ¶¶ 32-38, 54.)  The reduction in price

7   was attributable solely to the entry of generic terazosin and had nothing to do with

8   Abbott's having miraculously recouped its R&D costs, as its argument would have

9   this Court believe.[9]  (See SF ¶ 165; AUF ¶¶ 2-6, 28-38, 53-54.)  More importantly, the

10  price Abbott charged did not depend on the amount of its R&D costs.  If Abbott had

11  $1 of R&D costs or $100 billion of R&D costs it still would have charged $0.70 per

12  tablet until generic terazosin came to market.[10]  Finally, Abbott has not raised an issue

13  of material fact because it has not even articulated, much less proven, its alleged

14  "R&D costs."

15        Third, Abbott contends that, because it was still able to charge inflated prices to

16  a small group of purchasers after generic terazosin came to market, the price it

17  charged for Hytrin before generic terazosin came to market was not supracompetitive.

18  (Opp'n at 6-7.)  This argument makes no sense, as it ignores the undisputed fact that

19  Abbott lost 75% of its Hytrin sales within one year of generic terazosin coming to

20  market and was only able to retain a small percentage of its purchasers.  (See AUF ¶¶

21  32-38, 54.)  Aside from those outliers, Abbott was willing to offer terazosin to other

---

[9] Surely Abbott did not offer to sell Hytrin to purchasers such as Kaiser for $0.10 only to suffer a loss on each sale.

[10] Additional counter-factual hypotheticals are helpful.  Suppose Abbot found out long after the generic had been on the market that Abbott had neglected to pay a particular R&D cost that it thought had been paid.  Would Abbott have then raised the price for Hytrin?  No.  Conversely, if Abbott learned that it was receiving a rebate from a payment it had made for R&D costs, would Abbott have reduced the price for Hytrin?  No.  Finally, if a generic had never come to market, would Abbott have materially changed the price for Hytrin?  No.  Costs have nothing to do with Abbott's pricing of Hytrin.

7

**REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1  purchasers, including Kaiser, for just $0.10 per tablet immediately after generic

2  terazosin came to market—an 86% reduction in price.  (See SF ¶ 165; AUF ¶¶ 6, 32-

3  38, 54)  It is Abbott's willingness (and ability) to sell Hytrin for $0.10 a tablet that

4  determines the supracompetitive nature of the price it charged for Hytrin before

5  generic terazosin came to market.[11]  (SF ¶ 165; AUF ¶¶ 6, 32-38, 54.)

6       Finally, Abbott then argues that its price was not supracompetitive because the

7  only reason Abbott was willing to sell Hytrin to Kaiser for $0.10 per tablet was

8  Kaiser's unique buying power.  This argument is entirely contradicted by the facts.

9  Abbott reduced the price it was willing to charge Kaiser for Hytrin immediately after

10  generic terazosin came to market.  (AUF ¶¶ 6, 32-38, 54)  Abbott offers nothing to

11  suggest that Kaiser was a more formidable negotiator during the period of time after

12  the entry of generic terazosin than it was before.  In addition, Abbott offered similarly

13  precipitous (and immediate) price reductions to other purchasers of Hytrin that it

14  anticipated would switch to competing generic terazosin.  (SF ¶ 165.)

15  **B.    Abbott Does Not Dispute that It Actually Suppressed Generic**
       **Terazosin from Coming to Market.**
16

17       The supracompetitive price Abbott maintained for Hytrin is not the only direct

18  evidence of its monopoly power.  Abbott also paid manufacturers of generic terazosin

19  several million dollars per month not to come to market with generic terazosin, an

20  undisputed fact here.  (AUF ¶¶ 4, 19, 23, 45)  Addressing this damning direct

21  evidence only in a footnote, Abbott states that "those agreements represent nothing of

22  relevance additional to the fact...that generic drug companies' business model is to

23  capture market share by entering the market at prices significantly lower than the

24  prices previously charged in the market."  (Opp'n at 16 n.6.)  Whatever the existence

25  of the agreements establishes with respect to generic manufacturers, it is indisputable

26  _____

27  [11] This is, of course, why Abbott buries within the "background" section of its
    Opposition the suggestion that the supracompetitive nature of a price depends on the
    price at which Hytrin was actually sold and not the price at which it offered to sell it.

28  (Opp'n at 6.)

8

REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   that Abbott's willingness and ability to pay manufacturers several million dollars per

2   month to stay out of the market establishes its monopoly power.  (See AUF ¶ 45.)

3       **C.    Remeron**

4       Finally, Abbott attacks the sufficiency of Kaiser's direct evidence of Abbott's

5   monopoly power, citing In re Remeron Direct Purchaser Antitrust Litig., 267 F. Supp.

6   2d 675 (D.N.J. 2005).  In Remeron, purchasers sued a brand-name drug manufacturer,

7   asserting claims under Section 2 for delaying entry of a generic form of the drug.  267

8   F. Supp. 2d. at 678.  The plaintiffs and the defendants both moved for partial summary

9   judgment as to direct evidence of monopoly power, and the defendants also moved for

10  partial summary judgment as to indirect evidence of monopoly power.  Id. at 676.

11  The court did not consider or rule on the defendant's motion premised on ***indirect***

12  evidence and denied the plaintiffs' motion premised on ***direct*** evidence, finding that

13  the plaintiffs' proffered direct evidence was not "conclusive as to why [the

14  defendant's] prices were higher."  Id. at 676 n.1, 683.

15      Although the Remeron court ultimately held that the plaintiffs' lone evidence of

16  cheaper generic drugs was insufficient to establish monopoly power by direct

17  evidence, the court recognized that parties may move for partial summary judgment

18  on the basis of direct evidence of a defendant's monopoly power.[12]  Thus, the very

19  case cited by Abbott—in its introduction no less—establishes Kaiser's basic premise:

20  an antitrust plaintiff can establish monopoly power for purposes of its Section 2 claim

21  with direct evidence of the anticompetitive effects of the defendant's conduct and

22  without the need to engage in an inferential market-definition and market-share

23  analysis.[13]

24

25  _____

26  [12] The Third Circuit subsequently recognized that direct evidence may be used to
    establish monopoly power in a Section 2 case.  See Broadcom, 501 F.3d at 307 & n.3.

27  [13] Although the defendant in Remeron had also moved for partial summary judgment
    as to indirect evidence of monopoly power, the court deferred ruling on that motion.
28  267 F. Supp. 2d at 676 n.1.

**REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Even assuming that this Court were to apply the <u>Remeron</u> court's evidence standard, the undisputed direct evidence here satisfies that standard. In <u>Remeron</u>, plaintiffs relied exclusively on evidence that generic manufacturers sold the generic form of the brand-name drug for less than the brand-name drug was sold. <u>Id.</u> at 680-81. They lacked the additional categories of evidence presented here that (1) the brand name manufacturer offered to drop its price dramatically immediately upon generic entry; and (2) the brand name manufacturer excluded competition by paying off generic competitors to stay out of the market. Moreover, while Abbott parrots the assertion made by the defendant in <u>Remeron</u> that its R&D costs account for the higher price it charged for Hytrin, the facts render this argument unavailing. In <u>Remeron</u>, the brand-name manufacturer maintained its price following generic entry. Here, Abbott immediately offered to lower its price to $0.10 upon generic entry—an 86% reduction—conclusively establishing that "R&D costs" had nothing to do with the price at which it was willing to sell Hytrin. (<u>See</u> ¶¶ 6, 32-38, 54; <u>see also</u> SF ¶ 165). The undisputed facts here demonstrate conclusively that Abbott was able to charge prices higher than competition would allow and that it had monopoly power before generic terazosin came to market. Kaiser has met its burden.

## CONCLUSION

Abbott's arguments in opposition fail to address the uncontroverted direct evidence establishing that Abbott charged supracompetitive prices for Hytrin and suppressed manufacturers of generic terazosin from coming to market. These anticompetitive effects establish Abbott's monopoly power as a matter of law, rendering an analysis of indirect evidence unnecessary. For the foregoing reasons and those set forth more fully in Kaiser's Motion, the Court should grant Kaiser's Motion and find that Abbott possessed monopoly power prior to generic terazosin coming to market in August of 1999.

REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated: September 25, 2009

Respectfully submitted,

BLANK ROME LLP

By:    /s/  Ann B. Laupheimer
ANN B. LAUPHEIMER (*pro hac vice*)
JOSEPH M. PROFY (*pro hac vice*)
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103-6998
Telephone: 215.569.5500
Facsimile:  215.569.5555
E-mail: laupheimer@blankrome.com
        profy@blankrome.com

W. SCOTT SIMMER (*pro hac vice*)
HARDY VIEUX (*pro hac vice*)
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Telephone: 202.772.5800
Facsimile:  202.772.5858
E-mail: simmer@blankrome.com
        vieux@blankrome.com

***Attorneys for Kaiser Foundation
Health Plan, Inc.***

11

**REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 25th day of September 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

By: _Linda Sepulvado_
Linda Sepulvado

**REPLY TO DEFENDANT ABBOTT'S OPPOSITION TO KAISER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**